[Civ. No. 2552.  Third Appellate District.—January 22, 1923.]

CALIFORNIA PEAR GROWERS ASSOCIATION (a Corporation), Respondent, v. JOSEPH HERSPRING, Appellant.

[1] SALES—DETERIORATION OF FRUIT—CAUSE OF—EVIDENCE—FINDINGS. In this action to recover the balance of the purchase price of certain pears delivered by plaintiff's members to defendant, conceding that the trial court might have concluded from the evidence that the deterioration of the fruit was not due to any default on

the part of defendant, and that the fruit was defective when received, there was ample evidence to support the conclusion of the trial court that the deterioration was due to the inadequacy of defendant's plant to handle such a large amount of fruit as came to him under the terms of his contract, and to justify the judgment against defendant.

[2] ID.—TITLE TO FRUIT—TIME OF VESTING IMMATERIAL.—The failure of the quality of the fruit having been imputable to defendant's delay, it was immaterial whether the title vested in him when the fruit was delivered to his agent, the initial transportation company, or whether they remained the property of plaintiff until a reasonable time elapsed after their arrival at defendant's drier.

[3] ID. — TIME TO INSPECT — WAIVER OF RIGHT — LIABILITY FOR PAYMENT.—Where time is given for inspection before title passes, a reasonable time is allowed, having regard to all the circumstances in the case, and a failure to inspect or test within the time permitted by the contract or the law is a waiver of the condition qualifying the buyer's obligation to become owner of the goods or to pay for them, or of a condition subsequent authorizing return of the goods.

[4] ID.—DUTY TO MAKE IMMEDIATE INSPECTION.—Where the product to be inspected is of an extremely perishable nature, such as windfall pears, which require prompt shipment and speedy attention for drying, an almost immediate inspection after delivery is demanded.

[5] ID. — ACCOUNT STATED — REPUDIATION OF STATEMENTS. — The fact that defendant sent plaintiff itemized statements containing reductions for the rejected pears, together with checks for payment, did not constitute an account stated between the parties, where plaintiff never accepted the statements as a final adjustment of the demand, but at most merely tentatively acquiesced in the report, which was repudiated when plaintiff became fully informed as to the facts.

[6] ID. — ESTOPPEL — EVIDENCE.—The evidence having warranted the conclusion that there was no misrepresentation by plaintiff, that it had no intention of deceiving defendant, that it did not act with culpable negligence, that defendant had the means of acquiring knowledge of the condition of the pears and that he was not injured by anything said or done by plaintiff, the trial court was justified in finding against the special defense of estoppel, which was set up in defendant's answer.

[7] ID.—CONDITION OF FRUIT—PLACE OF INSPECTION—AGENCY—HEARSAY.—Plaintiff having directed the county horticultural commissioner to personally inspect the fruit "on the wharf," he was not acting within the scope of his authority as plaintiff's agent when he examined the fruit at defendant's drier; and a telegram from

him to plaintiff, in which he described the condition of the fruit based upon the examination at the drier, was properly refused admission as evidence against plaintiff. Such telegram was also objectionable as evidence against plaintiff where it was based, not upon his investigation, but upon reports made to him by the county horticultural inspector.

[8] ID. — WRITTEN CONTRACT — CONVERSATIONS — EVIDENCE.—The contract for the purchase of the fruit having been in writing, and there not having been any uncertainty therein, the trial court did not commit error in refusing to permit defendant to introduce in evidence conversations had with directors of plaintiff.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

Arthur C. Huston and Robert H. Schwab for Appellant.

Sapiro & Levey for Respondent.

BURNETT, J.—The action was for the balance of the purchase price of pears sold by the plaintiff to the defendant and plaintiff had judgment, from which defendant has appealed. The contract between the parties was in writing, executed on July 17, 1919, and we may quote the following provisions:

"1. Subject to delivery by growers under the standard pear crop agreement of the seller, the seller agrees to sell and the buyer agrees to accept and buy from the seller 1000 tons, more or less, windfall pears, at the price of thirty-five dollars ($35.00) per ton, f. o. b. riverbank, Sacramento River, during the season of 1919. 2. Said pears, up to the said quantity of 1000 tons, more or less, shall be delivered from any of the following grower-members of the seller, namely, as per list attached, all of whom are known to the parties hereto and the location of whose ranches and points of delivery are also known to the parties hereto. 3. Deliveries hereunder shall not begin prior to July 25th unless by mutual agreement or by consent, at the suggestion of the buyer. . . . 5. The pears shall be two inches and up, free from sunburn and immature pears and from pears which have begun to rot. . . . 6. The buyer shall inspect all fruit at the time of delivery and shall accept or reject the pears at

the drier. No rejection shall be made except on notice to the grower and for defects herein specified. . . . 8. The fruit shall be weighed at the drier. If there are no facilities there for weighing, the seller will accept the weights at the drier on tested scales or at the nearest public weigher and a certificate of weights shall be signed by the buyer and delivered immediately to the seller. . . . 9. The buyer further agrees to pay for all the pears delivered hereunder immediately upon delivery. 10. It is expressly agreed that all of the pears delivered hereunder shall be used by the buyer for drying only and shall not be sold or delivered directly or indirectly to any canner under any circumstances without the written consent of the California Pear Growers Association, and only upon such terms and conditions as the said Association may specify in writing."

The plaintiff is a nonprofit, co-operative marketing association whose members are growers of pears and the fruit was to be furnished by those whose names appeared on said list attached to the contract. The ranches upon which the pears were produced are located upon the Sacramento River and defendant's drying plant is just outside the city of Sacramento. After the execution of the contract defendant made arrangements for the transportation of the pears from the river bank by the Southern Pacific steamers to Sacramento and thence by the Northern Electric Railroad to his said plant. The fruit was of an inferior grade, shaken from the trees by the wind, of an extremely perishable nature, and requiring prompt shipment and speedy attention for drying. Not only by reason of the character of the pears, but also of the excessive heat of the summer and the lack of refrigeration was there necessity for economy of time in the shipment and the preparation of said fruit for drying. Prompt and expeditious carriage was furnished by said transportation companies and the fruit arrived in good season at the dryer. As to this there seems to be no dispute between the parties, but there is a vital disagreement as to the quality and condition of a large part of the fruit when it was delivered, and this controversy is the cause of the litigation. That much of the fruit was discarded and destroyed because it was unfit for drying or indeed for any use is shown without conflict and is not denied by respondent; but the association's claim is that "Mr. Herspring's plant was en-

tirely inadequate to accommodate the quantity of fruit purchased under this contract. As a consequence, the pears arrived at the dryer and were there compelled to stand unloaded for days. Deterioration was inevitable. When the fruit was eventually removed from the cars, a large quantity had become unfit. With each day the congestion became heavier and the period of delay longer. Hence, the quantity of spoiled fruit constantly increased." Appellant's position, stated generally, is that such condition was not due to any fault on his part, but that such fruit was defective when received, and therefore the loss should fall upon the association. The trial court took the view that the pears complied with the terms of the contract and would have continued of such quality if they had been unloaded and dried within a reasonable time; that the delay, which caused their deterioration, was a circumstance for which respondent was not responsible and hence the loss should be borne by appellant. This characteristic and determinative factor in the case appealed to the learned trial judge as follows: "The fruit season does not wait on anybody. You ship your fruit when it falls, when it accumulates, it does not keep. You can't hold it back to meet the necessities of anybody. It has got to be handled during that time, and anybody who buys that sort of fruit buys it with knowledge that it is a touch and go proposition; that it is a work of days and hours to preserve it, or it is lost; and Mr. Herspring undertook the purchase of a short-lived fruit, the picking of which could not be regulated by its owners; it had to be shipped as it fell during the season when it was available; and without the experience that the business required, without an established plant, without a worked out system, without efficient help—one who had had experience in those enterprises could see how such an enterprise would fail that was so loosely associated together, and the inevitable result happened. I have no doubt that Mr. Herspring did the very best he could under the circumstances, but his plant does not seem to have been qualified to handle such a large amount of fruit as came to him under the terms of his contract."

[1] That this theory thus announced clearly implying, if not expressly stating, that the failure in the character of the fruit was chargeable to the fault of appellant and not

to that of respondent, finds support in the evidence, cannot for a moment be doubted.

First, as to the quality of the pears when shipped, we find the growers testifying without contradiction that the fruit answered and fulfilled every requirement of the contract. This testimony showed further that the condition of the pears was such that it would continue unimpaired for from four to ten days after shipment. As an illustration of this testimony we may quote Albert A. Brown as follows: "I am a member of the California Pear Growers Association and shipped windfall pears to Jos. Herspring & Co. for the Association. I personally inspected the pears shipped by me. There were none less than two inches, free from worms, no withered or rotten pears among them. There were no sunburned pears." He further testified that they would have remained in good condition "about three, four, or five days at the ranch easily enough." Since the pears were shipped promptly and were only one or two days in transit it is a fair inference from the testimony of these witnesses that the fruit was in good condition when received by appellant and would have answered the purpose if it had been promptly attended to. There was much other testimony to strengthen and confirm the inference. Mr. Fred C. Brosius, the county horticultural commissioner, testified as follows: "Q. Did you see the pears consigned to Mr. Herspring at the docks at Sacramento? A. I saw them occasionally. Q. What was the condition of the fruit? A. July 29th, because the telegram designated that I should examine them there on arrival, all the pears on that day consigned to Mr. Herspring's drying yards were in my opinion very good quality windfall pears. The Court: Did you look on any other occasion? A. Yes, later on. I had occasion to visit the dock every morning to examine all eastern and cannery goods for the mealy bug, if for no other reason, and thus at various times I examined them and they were in fair condition, of course, some of it was in better condition than others. The Court: They were merchantable? A. Absolutely."

Mr. C. A. Wilkins, county horticultural inspector, testified also that he examined the fruit on the dock and while he found some of it was pretty ripe, "I can't say that I found any signs of decay or leakage at that time." The witness,

though, discovered a very different condition when he made an inspection in the drying yards. Then "the fruit was in all stages of maturity and possible decay," but he did not know how long it had been since the fruit arrived. He did add, however, "I think there were manifests showing some cars leaving Sacramento on the 27th or 28th of July and inspected on the 10th of August, those were the last cars." He further testified that he found four or five carloads of the fruit stacked in the yards "out in the sun" where it was quite hot and that there were not enough trays to handle the fruit. Indeed, as to the inability of the appellant to dispose of the fruit promptly the testimony of Mr. David Franklin Herspring is convincing. He was the manager of the drying plant during the months of June, July, August, and September, 1919, although he had no prior experience in such business, having been a veterinary dentist and before that engaged in the candy business. He testified that they had labor troubles at the plant with the first foreman; that he had trouble with laborers in the field because of the foreman; "that the foreman, on the day he resigned, went out in the field and induced the men to quit work, telling them that he would take them on a fishing excursion and would treat them royally; that a majority of the men left and that evening at 4 o'clock he picked up fourteen of the men and persuaded them to go back; that he put them to work in the sulphur houses; there were some boys working back there where these men left all this fruit piled up under the sheds; . . . that he could not handle the pears as they came in; that if there was a place for the men and capacity to handle the fruit they could have handled it, but that they lacked capacity for getting a spur and capacity for the men to do the work; they lacked the number of acres to handle the tonnage delivered; that the failure to handle those pears resulted from a lack of capacity and from lack of space; that they could not possibly unload every car the day it was delivered because at times they would not have four men."

We consider further quotation unnecessary, but deem it sufficient to say that, if it be co      'ed that a conclusion favorable to appellant might have been reached by the trial court, there can be no doubt that the finding in favor of respondent is abundantly supported.

[2] This result is not affected by the question as to when the title to the pears passed to defendant. There may be ground for a difference of opinion whether under the contract title vested when the pears were delivered at the river bank to defendant's agent, the transportation company, or whether they remained the property of respondent until a reasonable time elapsed after their arrival at Mr. Herspring's dryer. Many conflicting decisions are cited involving similar contracts, but we shall not review them, as the judgment must be upheld upon either theory. It is true that the trial judge expressed his opinion that complete delivery was made at the river bank, but he declared also that the failure in the quality of the fruit was imputable to appellant's delay.

However, we are controlled by the findings and therein no specific limitation as to the delivery is made. It was found "that under and pursuant to said contract, said plaintiff delivered pears to the value of $10,147.74 of the kind and quality as called for by the said contract, which said sum has been paid to said plaintiff by said defendant.

"That said plaintiff offered for delivery and acceptance and delivered to said defendant certain other pears under and pursuant to said contract, being the same pears alleged in said complaint as not having been paid for." Then follow specific findings that these pears complied with the terms of the contract and furthermore: "That it is not true that any pears offered for delivery and acceptance by the plaintiff were rejected by the defendant because of the fact that they were not free from sunburn, or were immature, or had begun to rot prior to their being offered for delivery and acceptance by the said plaintiff. . . . That it is true that plaintiff offered for delivery and delivered to said defendant certain pears, some of which were accepted by defendant, and others of which were rejected by the defendant as not meeting the requirements of said contracts, but that all of said pears so rejected by said defendant did meet the requirements of said contract, and that said attempted rejections by said defendant were improper and did not constitute rejection of the pears so delivered."

These findings are broad enough to embrace either of the suggested theories as to delivery, and in view of the evidence the trial court was not required to be more specific.

It is true that the court did not explicitly find that the delay of appellant in the inspection of the pears was unreasonable, but it is clearly implied in the findings which were made and which covered all the material issues of the pleadings.   [3]   It is not disputed that where time is given for inspection before title passes, a reasonable time is allowed, having regard to all the circumstances in the case and ''a failure to inspect or test within the time permitted by the contract or the law is a waiver of the condition qualifying the buyer's obligation to become owner of the goods or to pay for them, or of a condition subsequent authorizing return of the goods.'' (Williston on Sales, sec. 476; *Potter* v. *Holmes*, 87 Minn. 477 [92 N. W. 411]; *White* v. *Harvey*, 85 Me. 212 [27 Atl. 106].)   [4]   Of course, an instance like this demands an almost immediate inspection after delivery.   A delay of even twenty-four hours under the conditions to which we have referred might entail a loss of the right, and render the sale absolute, if we regard the vesting of the title as subject to the right of inspection.

We can see no merit in the claim that the payment of the price was a condition precedent to the passing of title. No doubt there are many such cases wherein the vendor is permitted to retain the title until paid, although he may have delivered possession to the vendee.   There is nothing in the contract herein, however, to give countenance to such view.   We construe the contract as an executory agreement to sell certain goods for a certain price and when they were delivered and accepted by defendant, or he had waived his right to reject them, the sale was executed and defendant became liable for the price.

Moreover, upon appellant's theory of the contract it was open to plaintiff either to recover the property or sue for the purchase price and an action brought to recover the purchase price is a ratification of the sale. (*Parke etc. Co.* v. *White River L. Co.*, 101 Cal. 37 [35 Pac. 442].) Herein, manifestly, the plaintiff pursued the only course that was feasible since the pears could not be recovered, as they were admittedly destroyed.   The only other possible remedy would be an action for damages, but if the complaint had been grounded upon that theory the loss would be measured by the contract price because at the time of defendant's breach the pears were valueless (Secs. 3311 and

3353, Civ. Code). It is therefore apparent that defendant would be in no better condition if plaintiff had adopted the suggested form of action.

[5] One of the main contentions of appellant is that there was an "account stated" between the parties. The source of this claim is found in the fact that itemized statements containing reductions for the rejected pears were sent by defendant to plaintiff, together with checks for payment, and it is urged that they were accepted without objection and therefore became binding upon the parties. The requisites of such account are not in dispute and need not be specifically considered. As to this claim the trial court found:

"That after the delivery of pears to said defendant by said plaintiff, defendant made a written statement of the quantity of the pears accepted and of the quantity of pears claimed to have been rejected, which said statement was delivered to said plaintiff, together with the check of said defendant in payment for the number of pears so accepted; that four such statements were rendered by said defendant to said plaintiff during the months of July and August, 1919; that such statements were not made and delivered by defendant to said plaintiff immediately after the acceptance or rejection of any pears offered for delivery or delivered by said plaintiff, but four of such statements were made during the months of July and August, 1919.

"That it is not true that plaintiff did not advise defendant that any rejections made by said defendant were not proper, or were not in accordance with the terms of said contract until after the last delivery of the statement following the last delivery of pears.

"That plaintiff made objections to statements furnished by said defendant within a reasonable time after obtaining knowledge of the facts concerning the delivery of pears to said defendant, and the attempted rejection of pears by said defendant."

There is evidence to support these findings. It is true that respondent apparently had faith in appellant and when said statements were made had no reason for doubting their accuracy. Mr. Herspring did not report the circumstances under which the inspection was made, but represented the trouble as due entirely to the conduct of the growers in

deliberately shipping decayed fruit.    Thereafter respondent as the result of investigations became distrustful of the integrity of appellant's reports, and a meeting was arranged at the San Francisco office, and according to the testimony of Mr. Hamilton, assistant secretary of the association, Mr. Herspring stated "that his plant—that the pears had been shipped there ten days earlier than he was in condition to handle them and unfortunately he was never able to catch up and the question of his statements was brought up and he thought it would be best for him not to send any more remittances to the company.    I suggested to him that the best thing he could do would be to return home and make out statements in this line with those previously sent us and the adjustment would be made at a later day.    Then he sent a check later."    It is quite plain that there is reason for the view that respondent never accepted the statements as a final adjustment of the demand, but at most there was a tentative acquiescence in the report, which was repudiated when respondent became fully informed as to the facts. For a fuller discussion of the elements of an account stated we may refer to the following cases cited by respondent: *O'Neill* v. *Eberhard,* 99 Or. 686 [196 Pac. 391]; *Gurnett* v. *Flick etc.,* 163 Wis. 574 [158 N. W. 325]; *Employers' Liability Assur. Corp.* v. *Kelly etc. Construction Co.,* 195 Ill. App. 620.

[6]    The trial court was entirely justified in finding against the special defense of estoppel, which was set up in the answer.    As to that, appellant relied upon the transaction in reference to said accounts of the amount of pears received and rejected and it was alleged "that plaintiff is now estopped from denying that said pears so rejected did not comply with the terms of said contract."

The facts pleaded, however, as well as the evidence, fall short of constituting or showing an estoppel.    As stated by respondent: "Ever since the decision of *Boggs* v. *Merced Mining Co.,* 14 Cal. 279, it is settled law in this state that in order to give rise to an estoppel the party to be estopped must be apprised of the true state of the facts and must speak or act with the express intention to deceive or with such careless and culpable negligence as to amount to constructive fraud, and the party asserting the estoppel must be destitute of knowledge of the facts and of the means of

acquiring such knowledge and must rely directly upon the statement or conduct of the other under such circumstances that he will be injured by allowing its truth to be disputed.'' (See, also, *Bias* v. *Reed,* 169 Cal. 33 [145 Pac. 516] ; *Mercantile Trust Co.* v. *Sunset etc. Co.,* 176 Cal. 461 [168 Pac. 1037].)

The record warrants the statement that there was no misrepresentation by respondent; that it had no intention of deceiving appellant; that it did not act with culpable negligence; that appellant had the means of acquiring knowledge of the condition of the pears and that he was not injured by anything said or done by respondent. The only loss, indeed, as we have seen, may be attributed to appellant's own failure to make prompt use and appropriation of the fruit.

Appellant complains of certain rulings of the court, but we find no prejudicial error therein.

A part of the evidence offered were certain reports of the condition of the pears made by Mr. Wilkins, the county horticultural inspector, but they were based upon an investigation made some time after the pears reached the dryer. While he was not definite in his statement as to the exact time when the various examinations were made, he did say, as we have seen, ''there were manifests showing some cars leaving Sacramento on the 27th or 28th of July and inspected on the 10th of August.'' There was no dispute that after such delay the pears were unfit for use. The theory that his reports were admissible because he was the agent of respondent is untenable. Mr. Brosius, and not Mr. Wilkins, was directed by respondent to make an examination of the pears and this examination was to be made at the wharf, whereas the inspection of Mr. Wilkins was at the dryer. But if it should be thought that these reports might properly have been admitted, it is manifest that no prejudice resulted in the ruling, for the reason that Mr. Wilkins testified fully as to the results of his examination of the pears. His reports could have added nothing to the force of his testimony.

[7] Appellant offered the following telegram from Mr. Brosius to the association: ''Pears arriving dryer fully five per cent rots, growers should grade out. Will inspect arrivals daily report you.'' The direction to him, however,

was to "personally inspect on the wharf." He did not follow the direction and, therefore, was not acting within the scope of his authority. Besides, his telegram was based, not upon his investigation, but upon reports which were made to him by Mr. Wilkins, and was objectionable upon that ground. Moreover, there was no controversy as to the condition of the pears at the time they were examined by Mr. Wilkins.

[8] Claiming that they were a part of the circumstances surrounding the execution of the contract and admissible under sections 1856 et seq. of the Code of Civil Procedure, appellant sought to introduce evidence of various conversations, but respondent's objection thereto was sustained. One of these questions, relating to a change that was made in the written contract providing that the fruit should be weighed "at the drier" instead of "on the river bank" was as follows: "At that time, Mr. Herspring, did you have any conversation with Mr. Edinger about that change?" Upon answering, "I did," he was asked the following question, to which an objection was sustained: "What was that conversation?"

He sought also unsuccessfully to introduce evidence of a conversation which he had with one of the directors of plaintiff after the execution of said contract with reference to the quantity of fruit which he could handle. These conversations were not admissible, of course, to vary the terms of the written instrument and they could be received as evidence of the surrounding circumstances only to aid in the proper construction of the written contract (sec. 1860, Code Civ. Proc.) if there were any uncertainty therein. We think the situation was not such as to admit of this extrinsic evidence. Moreover, since the materiality of the proposed evidence was not apparent, appellant should have stated what he proposed to prove in order that the court might be fully advised of his position. We may add that there was and is no contention that any mistake was made in the written contract, that any fraud was practiced in its execution, or that a different contract was afterward substituted for it. To the suggestion that all fruit should have been delivered as appellant was able to take care of it, it is sufficient to answer that, if he so desired, he should have so provided in the contract. No advantage was taken

of him in its terms and if he suffered loss through his misfortune, plaintiff was not responsible. Besides, it is clear that there could be no appreciable delay in the delivery as the pears demanded immediate attention. It is worthy of observation also that since the transportation from the river bank was under the direction and control of appellant he could regulate the receipt of the fruit at the dryer as far as its condition would permit.

We may not have noticed specifically all the points made in the able and exhaustive brief of appellant, but from a careful examination of the record we are convinced that we are not authorized to interfere with the decision of the trial court.

The judgment is affirmed.

Finch, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 22, 1923.

All the Justices concurred.