**T. W. WARNER CO. v. ANDREWS.**

District Court, S. D. New York.
June 29, 1936.

Eli J. Blair, of New York City, for plaintiff.

Straus & Osserman and A. M. Lowenthal, all of New York City, for defendant.

RIPPEY, District Judge.

The plaintiff in this action is a corporation organized and existing under the laws of the state of Delaware; and by virtue of the general appearance of the defendant in this action, the question of the residence of the defendant becomes immaterial.

On June 7, 1927, the plaintiff and the defendant entered into a contract in the state of California by the terms of which plaintiff agreed to sell 2,500 shares of the preferred capital stock and 1,250 shares of the common stock of the Peerless Scale Corporation, a Virginia corporation, together with scrip dividend No. 8 thereon for $5,000, to the defendant for the sum of $263,333.33, together with interest on the sum of $250,000 from June 1, 1927, to the date of payment, at the rate of 8 per cent.

per annum, either in cash or the promissory note of the A. M. Andrews Investment Corporation, which was a Delaware corporation, for such part of the principal sum as defendant did not pay in cash, payable in or before one year from date at Pasadena, Cal., to be indorsed and guaranteed by A. M. Andrews personally, to be secured by the delivery to the plaintiff in pledge of bonds to be issued on the refinancing of the Peerless Scale Corporation, having the first lien or claim upon the tangible assets of such corporation and its subsidiaries; to be equal in value to the face value of such note, which note should bear interest at the same rate as the bonds to be delivered as security; with power of sale of said bonds by the plaintiff under conditions stated in said agreement; plus 100 shares of the capital stock of the Liberty National Bank of New York City properly indorsed for transfer. Among other things, said agreement provided that the transaction should be completed and the purchase price paid and the Liberty Bank stock delivered on or before June 25, 1927.

The Peerless Scale Corporation stock and scrip for dividend No. 8 was delivered by the plaintiff in the form of an escrow, as provided in said agreement, to the Security Trust & Savings Bank, Pasadena branch, Pasadena, Cal., with instructions to deliver upon the defendant complying with the terms of the price to be paid. The agreement provided that in the event the defendant failed to carry out the agreement on or before June 25, 1927, the Peerless Scale Corporation stock certificate and dividend scrip and other papers were to be returned to the plaintiff.

The defendant failed to carry out that agreement, and on July 22, 1927, the parties entered into another agreement, which was a continuation of the previous agreement and supplemental thereto, whereby the defendant agreed to purchase the aforesaid stock and the scrip certificate which were deposited with the Security Trust & Savings Bank of Pasadena, Cal., on June 7, 1927, for the sum of $265,000, with interest on that sum at the rate of 7 per cent. per annum from July 1, 1927, on the unpaid balances thereof until paid, and to deliver certificates for 100 shares of the capital stock of the Liberty National Bank of New York City properly indorsed for transfer, conditioned, however,

upon the refinancing of the Peerless Scale Corporation by Lisman & Co., being completed; the payment of the $265,000 and interest to be made as follows: One-third thereof 15 days after public offering of bonds of the Peerless Scale Corporation; one-third an additional 30 days thereafter; and the balance 30 days thereafter. This, as I said before, was a continuance of the escrow agreement; and the Security Trust & Savings Bank, Pasadena branch, was directed by the plaintiff to deliver to the defendant such Peerless stock certificates and dividend scrip certificates upon payment in full of the principal sum and interest. Plaintiff reserved the right to withdraw the certificates if one-third of the principal sum was not paid on or before September 10, 1927.

The defendant made payment conditional upon the "Lisman deal" going through, and the "Lisman deal" was defined in these words: "One-third of the money fifteen days after public offering, bringing first payment approximately August fifteenth; one-third thirty days thereafter; one-third sixty days thereafter." The defendant also agreed that the first moneys received from the Lisman deal would be applied toward the payment of the purchase price, and that he would deposit his original Peerless notes with Lisman, which Lisman had to redeem to the amount of the purchase price in any New York bank. It was also agreed that the only funds which the defendant would have available with which to make payment under the contract would be from the moneys coming to him out of the Lisman deal, and Lisman was to have a reasonable length of time within which to complete the deal. Under the terms of the contract, the original Lisman notes referred to were agreed to be deposited in the Central Union Trust Company of New York before the bonds were offered to the public.

It is claimed by the defendant that there was no contract because of the indefiniteness and uncertainty of its terms. The defendant has definitely and unequivocally held, however, that the refinancing of the Lisman deal was completed according to the requirements of the contract. Under those circumstances, any claim by the defendant that the terms of the contract are indefinite and uncertain, and that therefore the plaintiff cannot maintain his action upon the contract, will not avail. The money from the Lisman refinancing was available and in the defendant's possession with which to purchase plaintiff's stock on December 18, 1927. It was no concern of the plaintiff's what the defendant did or omitted to do in connection with the bringing about of the Camco deal. That deal was no part of the original Lisman refinancing deal mentioned in the contract in suit. But if uncertain or ambiguous in its terms, the parties themselves have removed all uncertainty and ambiguity and have construed it, adopted it, and acted under it, and the court must accept their construction. Brooklyn Life Insurance Company v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Carthage Mills v. Carthage, 200 N.Y. 1, .14, 93 N.E. 60.

Whatever indefiniteness or uncertainty there may have been with regard to the terms of this contract had to do with the Lisman deal and the defendant's notes. The undisputed evidence establishes that the Lisman deal was under negotiation prior to June 7, 1927, and eventuated in a written contract under date of September 26, 1927. So far as material to the contract between the parties in this suit, the deal specified in the contract which is the subject of this action was embodied in said contract of September 26th, except as to dates of payment of installments of the purchase price by Lisman, which variance is not material. The deal specified by Andrews in the contract, so far as material, consisted of the sale to Lisman & Co., of $4,500,000 of bonds of the General Vending Company, which was the new name of the Peerless Scale Corporation, for the purpose of payment to the defendant of the outstanding issue of gold notes of the Peerless Scale Corporation, which were then owned by it, in the sum of $1,400,000, which notes were the notes referred to in the contract in suit, and also to provide for purchase of the stock of two or three other corporations, and to provide additional working capital for the General Vending Company or its subsidiaries.

The public offering of the bonds of the General Vending Company, referred to in the contract between the parties to this action, was made on October 4, 1927. The bonds in question were delivered to Lisman & Co., and paid for by them on December 12, 1927. On December 13, 1927, the defendant received the money in payment of his notes referred to in the contract, and the refinancing of the Peerless

Scale Corporation, so far as the parties to the contract in suit were concerned, was completed on that date by Lisman & Co.

On December 13, 1927, Andrews received from the General Vending Company out of the moneys paid to it by Lisman & Co., for the $4,500,000 of bonds of the General Vending Company, the sum of $1,469,582.21 in payment of the notes referred to in the contract in suit, with accrued interest thereon. He also received out of that money $531,823.33 for stock of the Hoff Vending Company, of which he was the owner and which was taken over by the General Vending Company, plus $100,000 which was paid for him to Rhodes-Hochreim Company, a subsidiary, making a total of $2,101,675.54.

In the meantime the stock of the plaintiff had remained in escrow. The time for final payment of the purchase price was fixed by the terms of the contract as December 18, 1927, contingent upon the completion of the Lisman deal above referred to. It has appeared, as I have previously stated, that that deal was completed, so far as the parties to this suit were concerned, on December 12, 1927. There is no doubt, therefore, that the plaintiff was entitled to its money which the defendant was required to pay by the terms of its contract on December 18, 1927.

On December 12, 1927, the defendant had in contemplation the organization of another company known as the Consolidated Automatic Merchandise Corporation, having as its purpose the merger of the General Vending Company and other corporations. Lisman & Co. found that they were unable to promptly dispose of the $4,500,000 in bonds of the General Vending Company which they had purchased, and to enable the latter to finance and carry out the new deal, known as the "Camco deal," the defendant loaned to Lisman & Co. $1,350,000 on that date. It is claimed by the defendant that that loan was a part of the Lisman deal referred to in the contract in suit, and that the Lisman deal was not, on December 12, 1927, completed as contemplated by the parties. The loan by the defendant referred to was separate and distinct from any refinancing of the Peerless Scale Corporation referred to in the contract between the parties hereto, and in no manner affected the contract or the time of completion of the contract between the parties. But if such were not the fact, the

money on this loan was all paid back to Andrews prior to April 19, 1928, while the escrow of the plaintiff's stock was still in effect. So far as this action is concerned, it thus becomes immaterial whether the refinancing of the Lisman deal was completed on December 12, 1927, or on April 19, 1928. In any event Andrews was bound to perform on one date or the other, and both dates were before the time of the commencement of this action.

The contract as above outlined was affirmed by the defendant in the complaint in Welch v. T. W. Warner Company (C. C.A.) 47 F.(2d) 232, and has repeatedly been asserted by way of affidavit and verified complaint of Andrews against the plaintiff and repeatedly affirmed by the defendant by his conduct and acts on and after December 12, 1927.

On January 3, 1928, the defendant wrote to the plaintiff that Lisman had failed to complete the refinancing of the Peerless Scale Corporation as contemplated by the agreement of July 22, 1927, which "precludes the purchasing of your stock as contemplated in the July memorandum." The plaintiff promptly refused to accept any repudiation of the contract, and then delivered $15,000 of Peerless dividend checks to the escrow holder to be delivered to the defendant upon taking up the Peerless stock. Between January 3d and January 16th, Andrews acknowledged that the deal had gone through, and that he had received some $2,000,000 out of it. but refused to pay the plaintiff money due on the contract. Thus Andrews admitted his immediate obligation to perform, but refused to perform.

On March 9, 1928, the plaintiff brought an action against the defendant for specific performance in the superior court of California, which action was later removed to the United States District Court. During the pendency of the California action Andrews attempted to change the status of the parties by securing an option on Warner's stock in the Peerless Scale Corporation, without success, and finally the plaintiff notified the defendant on the morning of June 6, 1928, that unless he paid $265,000 for the stock with accrued interest and delivered the 100 shares of Liberty National Bank stock to the bank holding the Peerless stock in escrow before the end of that day, the plaintiff would withdraw the Peerless stock from escrow and send it to New York for im-

mediate sale. The defendant failed to take up the stock within the time specified, and on the following morning the plaintiff sent the stock to New York for sale and discontinued his action in the California court.

On June 7, 1928, Andrews attempted to make a tender, and on June 9, 1928, he attempted to secure the Peerless stock from the plaintiff by the payment of $309,284.96. The law of this case has been established with respect to this attempted tender that the alleged tender was worthless. Welch v. T. W. Warner Company (C.C.A.) 47 F.(2d) 232, 234. The sum tendered was made up of $265,000 plus interest from July 1, 1927, at the rate of 7 per cent., plus $25,000 which was claimed to be the value of the 100 shares of Liberty National Bank stock because of the allegations in the complaint in the California action; but it has been held and is the fact that Warner did not demand that sum as damages, but did demand the delivery of the stock to which he was entitled; and in the event that the defendant was unable to deliver the stock in that action the plaintiff demanded that damages be awarded for the value of the stock. If the effort of the defendant to take up the Peerless stock meant anything, it meant that he recognized his obligation to perform. Andrews was unable to deliver the 100 shares of Liberty National Bank stock, and thus was unable to perform. Issue had not been joined in the California action on June 7, 1928. Andrews' counsel had been notified of the plaintiff's intention to amend the bill of complaint in that action to increase the sum stated to be the value of the Liberty National Bank stock to its true value, which was then much higher. Thus Andrews knew when he made his tender that his tender was insufficient, even though he was unable to deliver the Liberty National Bank stock itself.

█ It was held by Judge Woolsey in Welch v. T. W. Warner Co. (D.C.) 47 F. (2d) 231, that the commencement of this suit by the plaintiff in the California court did not, in any manner constitute a waiver of the provisions of the escrow, and that its discontinuance merely meant that Warner had made up his mind to resort to other remedies. As a matter of fact, the basis of that suit was an action for the recovery of the purchase price of the Peerless stock. The commencement of the California suit, therefore, constituted no election of remedies which would bar the maintenance of the present action. Brady v. Daly, 175 U.S. 148, 161, 20 S.Ct. 62, 44 L.Ed. 109; Slaughter v. La Compagnie Francaises Des Cables Telegraphiques (C. C.A.) 119 F. 588.

But Andrews was maneuvering for an additional clean-up on his own stock in connection with the Peerless or General Vending Company's consolidation with other corporations into "Camco," and it became necessary for him to keep Warner's stock off the market or to procure it on his own terms; so Andrews forthwith attached the Peerless stock on its arrival in New York in an action in the New York courts based fundamentally upon his rights under the contract of June 7th, as supplemented by the agreement of July 22d, to purchase the particular stock. Again by this action he affirmed the contract and the completion of all conditions precedent to performance so far as he was concerned. The action failed for want of jurisdiction; and another action was instituted in New York in the name of Welch, his secretary, to whom he assigned the cause of action, and the stock and cash belonging to Warner were again attached; but the defendant has averred and stated here that that action was in substance and effect an action by himself. Again Andrews affirmed the contract and asserted that the Lisman refinancing deal had been completed. By these means Andrews held up Warner's sale of the Peerless stock by the attachment suits, and prevented Warner from disposing of the stock on a market that would have produced nearly twice the amount specified in the contract as the selling price. Andrews doubtless had in mind that, in view of the rising market on Peerless shares, there was little likelihood that he would be compelled to pay damages in any substantial amount because of those suits (although the first was brought in a court without jurisdiction to entertain it) as subsequently appeared, other than sheriff's fees, the cost of the bond on releasing the attachments, and a possible fee to the attorneys who might vacate the attachments; and the vacating of the attachments necessarily would take time. It was subsequently held by the Circuit Court of Appeals that the vacating of the attachments was to cost Andrews only $13,000. T. W. Warner Company v. Andrews (C.C.A.) 73 F.(2d) 287, certiorari denied 294 U.S. 717, 55 S.Ct. 515, 79 L. Ed. 1250. This was a small price to pay

for holding Warner's stock off the market while Andrews was making arrangements for a prospective sale of his own stock, from which he was to receive approximately $2,600,000. The deal through which he proposed to make this sum consisted of a merger of the General Vending Company with other corporations into a new corporation known as the Consolidated Automatic Merchandise Corporation, referred to as the "Camco deal," which I have mentioned above. The actual agreement on this merger was reached July 17, 1928, and executed July 25, 1928. The attachments on plaintiff's stock which Andrews had agreed to purchase were released on July 18, 1928, after the time had passed when its offering by Warner could affect adversely the Camco deal. Warner then found there was no market for the Peerless stock. The preferred Peerless stock was unsalable until January 15, 1929, and the common stock was unsalable until August 15, 1929, because the Camco deal involved the exchange of the Peerless stock and General Vending Company stock for escrow certificates of Camco, which were not salable, the escrow to continue for one year certainly, and, at the option of Lisman, for an additional period of six months.

■ Thereupon, Warner brought his suit against Andrews for wrongful attachments. It was tried before Judge Coxe and reviewed by Judge Hand in T. W. Warner Co. v. Andrews (C.C.A.) 73 F.(2d) 287. According to the opinion of Judge Hand, Warner sought to recover in that action, among other things, for the difference in value between the shares when attached and when released, but both the trial court and the appellate court held that the form of action was inappropriate for the recovery of damages for the fall in the value of the shares and the lost difference in interest, and no recovery was had therein on that account. Therefore, that suit does not constitute a bar to the maintenance of the action here on trial.

■ Although the plaintiff was entitled to have the contract performed at any time after December 18, 1927, and made frequent demands on Andrews to perform, nevertheless the escrow continued and the contract was kept alive for the benefit of both parties until June 6, 1928, when final demand was made by the plaintiff on the defendant to perform. If demand on Andrews to perform were necessary at any time before the commencement of this action, the earlier demands as well as the last were each sufficient, and all of them were made while the Peerless stock was in escrow ready for delivery. Andrews had ample opportunity to perform. From June 7, 1927, to July 7, 1928, the Peerless stock remained at the place specified in the contract for delivery, available to Andrews on payment of the purchase price, and his failure to perform after December 18, 1927, constituted an unreasonable delay.

■ Where there is a breach of a contract by the buyer, the seller may (1) retain the goods for the vendee and sue for the entire contract price; (2) sell the property as agent for the vendee and recover the difference between the contract price and the price obtained on a resale; or (3) keep the property as his own and recover the difference between the market value at the time and place of delivery and the contract price. Moore v. Potter, 155 N. Y. 481, 486, 50 N.E. 271, 63 Am.St.Rep. 692; Krauter v. Simonin (C.C.A.) 274 F. 791; Cuthill v. Peabody, 19 Cal.App. 304, 125 P. 926.

■ The complaint is based on the theory that title passed to defendant, that plaintiff held the stock for the defendant, and that plaintiff might recover for the whole contract price. Title unquestionably passed to defendant at the latest when he was given notice to take it up. Cal.Civ.Code, § 1141 of March 21, 1872, in effect to 1931. It was then at the place specified in the contract as the place of delivery, and nothing remained for plaintiff to do under the terms of the contract. All conditions precedent to defendant's requirement to pay had been removed. The Lisman deal had been concluded as specified in the contract; defendant had received sufficient moneys therefrom with which to pay for the stock, which moneys he had agreed to use for that specific purpose. Defendant then became liable to pay the price specified. Reed v. Hayt, 109 N.Y. 659, 17 N.E. 418; Obery v. Lander, 179 Mass. 125, 60 N.E. 378; Hughes Manufacturing Co. v. Elliott, 178 Cal. 181, 172 P. 584; Pittsburgh Hardware & Home Supply Co. v. Bown (C. C.A.) 174 F. 981; Pearson v. Mason, 120 Mass. 53; California Pear Growers' Association v. Herspring, 60 Cal.App. 503, 213 P. 518; Higgins v. California Prune & Apricot Growers, Inc. (C.C.A.) 16 F.(2d) 190.

■ The act of plaintiff in removing the stock from the Pasadena Bank on June 7,

1928, and in sending it to New York City for sale did not change the situation of the parties or the rights of plaintiff or the obligations of the defendant. Although title had passed, plaintiff had a vendor's lien for the price, which lien he could enforce by resale after payment by defendant had been deferred beyond a reasonable time. D'Aprile v. Turner-Looker Co., 239 N.Y. 427, 147 N.E. 15, 38 A.L.R. 1426. The plaintiff was the agent of defendant in so doing and was acting in an effort to reduce damages.

The contract was made and was to be performed in California. Where title has passed and is vested in the buyer, the measure of damages for the breach of the buyer's contract to accept and pay for the goods is the contract price. Cal.Civ.Code, § 3310; Hind v. Oriental Products Co., Inc., 195 Cal. 655, 235 P. 438. The law in New York State was the same. Hunter v. Wetsell, 84 N.Y. 549, 554, 38 Am.Rep. 544; Agar v. Orda, 264 N.Y. 248, 190 N.E. 479, 99 A.L.R. 269.

▮ Defendant most insistently asserts that the contract was executory only and that the complaint is one for damages where the measure of recovery, if any, is the difference between the price specified in the contract and the market price at the time and place of delivery. If that is so, plaintiff complied with the rule of damages by showing there was no market for the stock after it was removed from the Pasadena Bank and plaintiff was free to sell. Under such circumstances he might take the contract price as the amount to be recovered. Fisher Hydraulic Stone & Machinery Co. v. Warner (C.C.A.) 233 F. 527. Thus it becomes immaterial on which theory the complaint was framed. The amount of recovery would be the same in either event. If otherwise, the argument of defendant cannot avail, for plaintiff was permitted at the close of the trial to amend to conform to the proofs and the proofs established that title passed to defendant prior to June 7, 1928. Thus, whether the contract may be construed as executed or executory and whether the complaint may be construed as one for price or for damages, the damages which plaintiff may recover are the purchase price of the stock as fixed by the contract.

The law of California, where the contract was to be performed, provides for 7 per cent. interest per annum on all sums after they become due, if not otherwise expressly provided for; otherwise, at the rate specified in the contract (sections 1915, 1916, Cal.Civil Code; Cal.General Laws 1931, Act 3757). The contract provided for interest on $265,000 at the rate of 7 per cent. until that sum was paid.

The plaintiff was also entitled to receive 100 shares of Liberty Bank stock on December 18, 1927. On January 1, 1928, the holder of those shares was entitled to purchase for the sum of $20,000 100 additional shares. Both parties hereto were financially able to purchase such shares. The plaintiff was entitled to all the rights the 100 shares carried with them, and to recover the highest market value of the stock and of its accretions and rights subsequent to December 18, 1927. The evidence establishes that the market value of this stock on May 22, 1928, with accretions to which the plaintiff became entitled on January 1, 1928, was $88,000. Its market value to plaintiff on May 22, 1928, was $88,000 less $20,000 which he would have been required to invest to acquire the extra 100 shares, or $68,000. Other evidence of higher value or profit is lacking. The sum of $68,000, with interest at 7 per cent. per annum from December 18, 1927, is the sum to which the plaintiff is entitled as the value of the Liberty National Bank stock in lieu of a delivery of the stock itself.

The defendant's motion to dismiss the complaint will, therefore, be denied. Also, the defendant's motion for the direction of a verdict must be denied. The plaintiff's motion for the direction of a verdict must be granted, with costs. I, therefore, direct a verdict for the plaintiff and against the defendant for the sum of $540,504.01.