[Civ. No. 20911. Second Dist., Div. Two. Sept. 27, 1955.]

W. G. JOHNSON et al., Respondents, v. COMPTOIR
FRANCO-BELGE D'EXPORTATION DES TUBES
D'ACIER (a Corporation) et al., Appellants.

684

McClean, Salisbury, Petty & McClean for Appellants.

Kolts & Kolts for Respondents.

MOORE, P. J.—Alleging damages on account of appellants' failure to deliver 505 tons of steel pipe which they had sold to respondents, the latter brought this suit and recovered judgment in the sum of $2,134, despite appellant's cross-complaint. Appellants still maintain not only the injustice of the judgment but also the worthiness of their own cause.

The alleged contract arose out of a maze of correspondence among a number of firms and corporations, each of which evidently intended to profit by the sale. The firms involved are as follows:

Griffith Pipe and Supply Company, a corporation of Los Angeles, herein referred to as "Griffith."

Johnson and Fine, respondents, are copartners, operating under the fictitious name of National Steel Fabricators, hereinafter designated as "National."

Gladstone and Company of Los Angeles, herein referred to as "Gladstone."

Impex Corporation of Los Angeles, herein referred to as "Impex," which was associated with Gladstone with respect to the purchase of the pipe.

Comptoir Franco-Belge D'Exportation Des Tubes D'Acier, a corporation of Paris, France, and an agent of U.T.M., herein referred to as "Comptoir."

Societé Anonyme des Usines a Tubes de la Meuse, a joint stock company of Flemalle-Haute, Belgium, engaged in the manufacture of steel pipe, herein called U.T.M.

### THE EVENTS

On July 15, 1952 Griffith ordered from National 505 tons of steel pipe, duty prepaid, also cost, insurance, freight, wharfage and handling, to be delivered in July, pipe to be accepted if shipped in accordance with a letter of credit to

be issued by Security First National Bank of Los Angeles. National agreed to all the terms of the purchase order and delivery date was extended to August and September.

On the same day of Griffith's order, National purchased the pipe from Gladstone at a price f.o.b. Antwerp, Belgium, to be delivered in July or August, a letter of credit in favor of U.T.M. to be furnished for the cost of the pipe; also a letter of credit for 3 per cent of the cost of the pipe, in favor of Gladstone.

On August 6, Impex ordered the same pipe from Comptoir (U.T.M.'s agent) as that which National had ordered from Gladstone. The order specified no date for delivery, but recited that a letter of credit had been forwarded to the Bank of Brussels for the account of U.T.M., which letter was to expire October 5, 1952. On September 2, 1952, as sales agent of U.T.M., Comptoir accepted the Impex order and agreed to ship the 505 tons of pipe "within the validity of the credit, unless unforeseen circumstances."

On August 6, 1952, Security First National Bank at Griffith's request issued its assignable and divisible letter of credit No. 11316 to National in the sum of $100,000 which specified (1) kinds of pipe by weight, price and destination; (2) letter to be valid to and including October 6, 1952. The pipe and its price so described in such letter is the pipe National had agreed to sell Griffith and for which Griffith had agreed to pay National, duty prepaid at Los Angeles.

On the day of the issuance of the letter of credit, National assigned it to U.T.M. The assignment covered the same pipe described in the letter of credit but designated the prices specified in the contract between Impex and U.T.M., f.o.b. Antwerp.

On August 21 and 27, 1952, the letter of credit was amended with respect to the description of the pipe and inspection certificates. It was again amended on September 29 with respect to prices of 1½-inch and 2-inch pipe; also, it was made to specify "freight collect," in conformity with the contract of Impex and U.T.M.

From the orders made, and their acceptance by appellants and from the letter of credit and its assignment, appellant U.T.M. had become obligated to deliver 505 tons of steel pipe to National at the designated coastal points by October 6, 1952. It failed to meet its obligation.

## BREACHES

On October 4, U.T.M. shipped about 220 tons of pipe aboard

the S.S. Washington consigned to National at Los Angeles. On October 8, 1952, U.T.M. marked its bills of lading "freight collect," drew them to the order of National, attached the commercial invoices and inspection certificates for the 220 tons of pipe which had been shipped; and two days later the Bank of Brussels drew on the Security First National for $43,056.68. Thereupon the bank notified both Griffith and National of the tardiness of the draft and the shipment which U.T.M. concedes was a breach of the contract. While waiting for Griffith to determine upon its policy with respect to the delay in the shipment and the payment of the draft from Brussels, National endorsed the four several bills of lading.

But on October 23, 1952, the Security Bank informed National that Griffith had refused to extend the letter of credit, and that it could not deliver the documents conveying title without instructions from the Bank of Brussels. On the same day, National took two other steps which might be considered evidence of either of two intentions: (1) It notified U.T.M. that it had arranged with other parties who use steel pipe to accept the pipe on arrival, and (2) asked U.T.M. to instruct the Bank of Brussels to give Security Bank instructions to deliver documents of title to National on payment of the draft for $43,056.68. From such conduct, the court might have determined that National intended to exercise dominion over and ownership of the 220 tons, or, as the court did find, that National was taking precautions to avoid loss, as far as possible, to the shipper. That such was its intention is indicated by National's further demand on Security Bank that the latter hold the documents of title for National's instructions. Also, National cancelled its endorsements on the four bills of lading in order (1) that it might sell the 220 tons to other parties and (2) that Security might be able to negotiate a transfer of the cargo without consulting National. As a consequence, the bank was enabled to deliver the documents of title to any purchaser, having already on October 28 been authorized by U.T.M. to deliver the title documents against payment of the draft drawn by the Bank of Brussels. National never took physical possession of the pipe and rejected the offers of U.T.M. to ship the balance of the 505 tons. Neither did it offer U.T.M. or its agent to take the 220 tons whose invoice price was $43,056.68. Thereafter, U.T.M. caused the pipe to be sold for $34,600, out of which was paid $10.248.87 for freight, storage, commission and other customary charges, leaving the net amount received by U.T.M. at $24,346.11.

The court found that a valid contract of purchase and sale had been made by Impex and U.T.M. and concluded (1) that as between National and U.T.M. "privity of contract" existed by virtue of National's assignment of the letter of credit No. 11316, and by U.T.M.'s "invoicing the pipe to National and treating National as the principal in said contract"; (2) that the breach of the Impex contract by U.T.M. resulted in its liability to National; (3) that National's acts after the expiration of the letter of credit No. 11316 "did not constitute acceptance of the pipe shipped to it by U.T.M."

Respondents sued for breach of contract, alleging that they stood ready, willing and able to pay, but that the pipe was not delivered as contracted for by October 5, 1952. Appellants concede "that the shipment of only 220 tons of the 505 tons provided for in the Impex-U.T.M. contract after 'validity of the letter of credit' constituted a breach of said contract by U.T.M. both as to amount of pipe and time of delivery" but contend that the conduct of National after the breach constituted acceptance, and demand in the cross-complaint both general and special damages.

Basing the conclusions upon its findings that National did not accept physical delivery or pay U.T.M. for the pipe shipped aboard the S.S. Washington, and that National's conduct subsequent to October 15, 1952, did not constitute acceptance of said pipe, the court entered judgment in favor of respondents.

Appellants contend that there was no contractual relation between National and either Comptoir or U.T.M.; that as no contractual relationship existed, the assignment of the letter of credit by National to U.T.M. did not create a privity of contract between National and U.T.M. with respect to the Impex-U.T.M. contract. Their logic is that National issued its purchase order to Gladstone, not U.T.M.; that Impex, not National, contracted to purchase the pipe from U.T.M.; that when National assigned its letter of credit to U.T.M., it was in accordance with the express requirements of National's agreement with Gladstone; that U.T.M. had no direct contract with National. Numerous cases are cited, including *Asbury Park & Ocean Grove Bank* v. *National City Bank*, 35 N.Y.S.2d 985, to sustain appellants' thesis that a letter of credit is a contract which is independent of the contract of purchase between the seller and the purchaser; and as no other contract existed between National and

U.T.M., there was no privity of contract through the letter of credit.

The trial court properly concluded that U.T.M.'s treatment of National as a principal: (1) by its invoicing the pipe to National, (2) by its acceptance of the letter of credit from National—constituted privity of contract. Appellants alleged in their answer that "these defendants agreed to sell and the plaintiffs agreed to purchase five hundred tons of pipe . . ." It is elementary that a pleader is bound by his pleadings unless they are withdrawn by amendment. (*Brown* v. *Aguilar*, 202 Cal. 143, 149 [259 P. 735].) No amendment was offered by appellants. In truth, in their cross-complaint for damages for breach of contract, no other party is joined: neither Impex, Gladstone nor any combination thereof is mentioned. It can only be concluded that appellants were dealing solely with National, and National with appellants. In no instance do respondents urge that the letter of credit constituted the sole contract between the parties, but they maintain that it was placed in evidence for the sole purpose of emphasizing that a direct contractual relationship did exist. It is unreasonable to assume that the letter of credit for $100,000 would be endorsed, as in this case, to one not a principal.

The authorities cited by appellant are distinguishable in that they cover only situations in respect to which it had been contended that the letter of credit in itself constituted a contract. Such is not the case at bar.

Appellants contend that National's conduct with respect to the 220 tons of pipe constituted acceptance of said pipe under Civil Code, section 1768, which states that the "buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them . . ." In this connection, appellants interpret respondents' letter* of Octo-

---

*October 23, 1952

Ste. Ame des Usines a Tubes de la Meuse
Flemalle-Haute
Belgium
Gentlemen:

Reference: Cde. 9204 du 6.8.52 Aff. 5852
H FBT:6042
Our letter of credit #11316
dated Aug. 6, expired Oct. 5, 1952

We have today cabled you as follows:

"Reference credit 11316 expired instruct Bank Brussels immediately notify Los Angeles bank to release documents to us upon our payment their draft."

To explain further, the Bank of Brussels draft is dated October 8,

ber 23, 1952, as an acceptance of the 220 tons of pipe. In support of their contention, they cite that National (1) offered the pipe for resale; (2) endorsed the bills of lading; (3) asserted ownership to the bank, and (4) asserted dominion and control over the pipe.

On the contrary, the quoted letter shows that respondents accepted delivery upon the conditions recited. The additional terms specified were not accepted by U.T.M. Whenever a contract is breached, it is the duty of the offended party to take every reasonable step to prevent loss to himself and to minimize the damages he has suffered in order to avoid or reduce the loss to be suffered by the offending party. (*Winans* v. *Sierra Lbr. Co.*, 66 Cal. 61, 65 [4 P. 952]; *Russell* v. *Ross*, 157 Cal. 174, 181 [106 P. 583].) By their letter, respondents were attempting to sell the pipe to the best advantage, either by obtaining the same prices or as good as the market could afford. Because they failed to do so, no good reason appears why they should be penalized for an attempt to do their duty. An officer of the Security Bank testified that upon receipt of a cablegram from appellants, they considered that they had authority to throw the shipment of pipe on the open market, and if anyone had come in with sufficient money to pay the draft, he would have received the pipe. Further, "the law imposes upon everyone engaged in the performance of a contract the duty of doing everything in his power to prevent loss to himself from a breach of the contract by the other party. If he cannot

1952, whereas the letter of credit expired October 5, 1952. Our original purchaser of this pipe has cancelled the letter of credit due to your inability to ship on time and he is already in possession of European pipe which was purchased much later than your pipe.

However in view of the fact that we have spent so much time and much money with regards to your material we have made arrangements with other users to accept the shipment when it arrives. The ss/Washington is due to arrive in Los Angeles on or about November 1, 1952. We will lose considerable money on this shipment, through no fault of ours but we will do the best we can.

The Security-First National Bank of Los Angeles has instructed us to notify you to, in turn, notify the Bank of Brussels to instruct the bank in Los Angeles to release the documents to us when we pay the draft.

If you will please instruct your Brussels bank as outlined, we will make the necessary arrangements here.

Thank you for your promptness in this regard, and please notify us when you have done the above.

Very truly yours

NATIONAL STEEL FABRICATORS

CC:Comptoir FBT Paris [signed] Samuel Fine
SF/hl

prevent it altogether, he must make reasonable exertions to render it as light as possible." (*Winans* v. *Sierra Lbr. Co., supra*; *Russell* v. *Ross, supra*.) The trial court in interpreting the evidence before it—from the fact that respondent had previously written that only a loss could occur—found that they were merely trying to mitigate the damages and salvage what they could from the breach of contract by appellants. Even though other inferences could reasonably be drawn from the facts, this court is without power to substitute its conclusions for those of the trial court. (*Fischer* v. *Keen,* 43 Cal.App.2d 244, 250 [110 P.2d 693].) In answer to appellants' assertion that National had endorsed the bills of lading, it is necessary to refer only to appellants' own statement of the facts: that upon notifying U.T.M. on October 23 that they would try to place the pipe with other prospective purchasers, National on the very next day cancelled its endorsement upon the four separate bills of lading. Naturally, it retained authority to supervise any sale of the pipe although it was now on the open market, for National stood to be out of pocket on the entire transaction and in its own interest must obtain the best possible sale.

As to appellants' contention that National asserted dominion and control over the pipe, it need only be observed that if such control was asserted, it did not constitute an acceptance. Finding 46 declares: "National did not accept physical delivery of the said pipe shipped by U.T.M. aboard the S.S. Washington." Finding 47 is: "National did not pay U.T.M. for the said pipe shipped aboard the S.S. Washington." From such findings, the conclusion was logical that "National's conduct subsequent to October 15, 1952, did not constitute acceptance of the pipe shipped by U.T.M." These findings are all supported by sufficient substantial evidence and therefore must prevail, even though a contradictory inference from other acts or correspondence might have been warranted. Respondents' letter of October 24 was addressed to the Security Bank and was merely a part of their campaign to serve the best interest of U.T.M.

Appellants contend that National waived its right to sue for damages for breach of contract by accepting the pipe and failing to give notice of the breach of contract within a reasonable time after acceptance of the pipe, citing Civil Code, section 1769. (*Reininger* v. *Eldon Mfg. Co.,* 114 Cal.App.2d 240 [250 P.2d 4]; *Williston on Sales,* rev.ed., § 484(a); *Whitfield* v. *Jessup,* 31 Cal.2d 826 [193 P.2d 1]; *Rest., Con-*

*tracts,* § 412.) The cited decisions are distinguishable; none of them deals with a situation where the goods were not shipped according to a contracted schedule.

The court below found that National's dealing with the pipe on arrival did not constitute a waiver of the breach. As to notification, nothing could be more definite than National's letter of September 22, 1952, which reads in part: "By your failure to ship as specified, you are putting us in a very delicate situation with our customers . . . We will be subject to lawsuits if we do not perform, and we will *hold you liable* for any damages brought against us." Such language was a forewarning that delay in shipment would prove to be fatal. All negotiations subsequent to arrival were for the purpose of preventing loss.

■ Appellants contend that Comptoir as the agent is not liable for U.T.M.'s breach.

Again, it must be reiterated that a pleader is bound by his pleadings. (*Brown* v. *Aguilar, supra.*) The first assertion made, since the action was filed, that Comptair did not deem itself to be bound as a principal is now made to this court. The trial court found upon substantial evidence that National accepted both the agent and the principal with no intention of making an election. (*Marshall* v. *Bernheim,* 64 Cal.App. 283, 285 [221 P. 401] ; *Sumner* v. *Flowers,* 130 Cal.App.2d 672, 675 [279 P.2d 772].) Hence, both U.T.M. and Comptoir are liable.

■ Appellants contend that National accepted the 220 tons of pipe and is therefore liable to appellants on the cross-complaint. If an offer was made by respondents to accept the pipe for their own use instead of for Griffith, no acceptance of such offer on the part of U.T.M. appears in the record. The testimony shows that the pipe was thrown on the open market. From all the facts, the trial court correctly concluded that there was no acceptance on the part of National.

■ This court will not interfere with a factual finding of the trial court that is clearly supported by substantial evidence. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].)

The judgment is affirmed.

McComb, J., and Fox, J., concurred.