[Civ. No. 6691. First Appellate District, Division One.—July 26, 1929.]

KINGS COUNTY PACKING COMPANY (a Corporation), Appellant, v. SUNLAND SALES COOPERATIVE ASSOCIATION (a Corporation) et al., Respondents.

Carl E. Lindsay and Lindsay & Gearhart for Appellant.

M. B. Harris, Harris, Johnson, Willey & Griffith and Harry M. Creech for Respondents.

THE COURT.—This appeal is taken by appellant from the judgment in its favor for the sum of $250 and in favor of respondents for their costs incurred in the action amounting to $147.47. There are five counts or causes of action set forth in the complaint. The first four are for damages because of the alleged breach of a certain contract existing between appellant and respondents. The fifth is a cause of action for money had and received to the use of appellant in the sum of $600. It was upon this fifth count that the court rendered judgment in favor of appellant for $250. Appellant states that as the amount involved under the fifth count is so small no attempt will be made on this appeal to question the findings or judgment in that particular, but does urge with respect to the other four counts that the findings wherein the court found appellant had breached its contract are not supported by the evidence, but, instead, the evidence shows that the contract was breached by respondents. We have referred to respondents in the plural, although the contract was signed but by Sunland Sales Cooperative Association, for the reason that it is alleged in the complaint and admitted in the answer that Sunland Sales Cooperative Association, in the matter of the making and executing the agreement and in all matters connected therewith, acted as and was the agent and broker of respondent Sun-Maid Raisin Growers Association and Sun-Maid Raisin Growers Association of California, and consequently if the alleged breach of the contract was committed by the Sunland Sales Cooperative Association, all three of the respondents are bound thereby.

The facts are without material dispute. The appellant Kings County Packing Company is engaged in the business of packing and selling canned fruits. Its plant is situated at Armona, Kings County, California. Several years prior to 1925 it began to pack and sell canned raisins of the Muscat type. It built up quite a large business along that line, particularly in the southern states. A few years prior to 1925 the Sun-Maid Raisin Growers took over this

business and under a contract with the Kings County Packing Company the packing company canned Muscat raisins for the Sun-maid Raisin Growers, which in turn marketed the product. This particular branch of business was discontinued by the Sun-Maid Raisin Growers in 1924, and the Kings County Packing Company concluded to resume for its own account such enterprise. It was with that end in view that in June, 1925, the Kings County Packing Company entered into the contract in question with the Sunland Sales Cooperative Association. At that time of the year it would, of course, be impossible to determine the volume of the raisin crop maturing in September and October. The Sun-Maid Raisin Growers organization having control of the major portion of the product to be produced by the growers throughout the raisin districts and the remainder of the product being divided among a number of independent packers, the Kings County Packing Company endeavored to obtain such quantity of Muscat raisins as it might need for its enterprise from the Sun-Maid Raisin Growers, and that was done or arranged for by the agreement referred to. The agreement is simple in its terms and unmistakable in its language. The Sunland Sales Cooperative Association is therein called the "seller" and Kings County Packing Company the "buyer." The covenants of the agreement were to the following effect: the buyer agreed to purchase and to receive from the seller, and the seller agreed to sell and deliver to the buyer the buyer's entire requirements of 1925 crop of Muscat raisins; the buyer was to pay therefor for two-crown loose Muscats per pound the price quoted by the seller on fifteen-ounce seeded cartons less four cents, with a minimum of four and a half cents per pound, and for three-crown loose Muscats per pound the price quoted by seller for fifteen-ounce seeded cartons less three cents, with a minimum of five and a half cents per pound. It should be mentioned, in passing, that fifteen-ounce seeded cartons referred to a certain pack of raisins which were at that time being marketed and had for a long time been marketed throughout the country by the Sun-Maid Raisin Growers organizations. This pack consisted of a carton containing fifteen ounces of seeded Muscats. The Sun-Maid Raisin Growers organizations marketed many other packs, but the

basis for the charge to be made to the Kings County Packing Company for raisins ordered by it and delivered under the contract was the quoted price of the Sun-Maid Raisin Growers organizations for its fifteen-ounce seeded carton packs. The Sunland Sales Cooperative Association, a subsidiary organization of the Sun-Maid Raisin Growers, acted as the sales agent for the cooperative association. Its sales operations extended throughout the United States, the Dominion of Canada and other foreign countries. Its operations were explained by Ellsworth Bryce, whose deposition was read in evidence at the trial. His testimony reduced to a narrative form was substantially as follows: I am manager of the sales administration division of the Sunland Sales Cooperative Association; in general I direct the sales activity of the sales organization under the explicit direction of our sales counsel; I have charge of the sales personnel and the administration of the sales under the specific direction of the sales counsel; the particular business of the Sunland Sales Cooperative Association is merchandising for cooperatives and we do merchandising for the cooperative association known as the Sun-Maid Raisin Growers of California; we handle the entire line of merchandise that they manufacture, consisting of Sun-Maid raisins and syrup and different by-products thereof; we sell for them and recommend the prices on the commodity; the recommendation is either approved or disapproved and, if it is approved, we wire out to our divisional sales offices making the price effective; these divisional sales offices are located in seventeen cities in the United States and Canada; some of them are New York, Chicago, Pittsburgh, Boston, Atlanta, San Francisco, Los Angeles, Seattle, Vancouver, Montreal, Dallas, New Orleans, Kansas City and Denver; we sell the Sun-Maid raisins in different styles of packages; among them was a package known as the 15-ounce seeded Muscat package; those 15-ounce seeded Muscat cartons contained seeded Muscat raisins. Another official of the Sunland Sales Cooperative Association, Millard S. Bury, testified regarding the way in which the marketing of the products of the Sun-Maid Raisin Growers was done and the manner in which prices were quoted substantially as follows: I am assistant to Mr. Bryce, assistant to the manager, sales administration divi-

sion Sunland Sales Cooperative Association, and have been acting in that capacity from the first part of October, 1925; since that time I have been in charge of the contract department, as well as acting as assistant to Mr. Bryce, having supervision of sales administration in his absence. In November, 1925, we had seventeen divisions and it was our practice to wire from the home office to the divisional offices information relative to prices and withdrawals of different packs and brands of our products; we had a manager at each of these different divisions and we wired that manager; referring to our different products we used different terms; one was "cartons"; "cartons" means a particular pack, that is, puff pack, carton puffed pack; we were then just getting into distribution of puff raisins; we had announced them a few months before that; "package" was our term for 15-ounce seeded Muscats, the old style seeded package; wherever there is a reference to "package" and wherever that term is used it meant the 15-ounce old style carton seeded, not the puffed. This witness also testified that the prices for the various packs of raisins set by the Sunland Sales Cooperative Association were not communicated by that organization directly to the trade but that such quotation was done by the divisional offices. So it appears from the testimony of these two officials of the Sunland Sales Cooperative Association, Ellsworth Bryce, the sales manager, and Millard S. Bury, his assistant, that the manner in which prices for the various packs of raisins handled by that organization for the Sun-Maid Raisin Growers were quoted to the trade was as follows: The sales organization fixed a price for the various packs which, when agreed to by the Sun-Maid Raisin Growers, became the established price to be quoted to the trade, thereupon the Sunland Sales Cooperative Association would wire instructions to the seventeen divisional offices scattered throughout the United States and Canada, which divisional offices would then in turn issue circulars to the trade quoting the price.

It appears from the record without dispute that in September and October, 1925, it was found that Muscat grapes were not plentiful; that the crop itself was light, and, further, that because of the conditions prevailing a quantity of this variety of grapes had been sold by the producers

green, which means that they were picked, boxed and shipped to eastern markets in an undried condition, and that the quantity of Muscat raisin grapes of the crop of that year produced and dried by the vineyardists was much less than in former years. It also appears that the Sun-Maid Raisin Growers that year were placing on the market a new variety of raisin which they termed "Puffed," prepared through a secret process and over which Sun-Maid Raisin Growers Association had a monopoly. It is argued by counsel for appellant—and not without force or support in the evidence—that the price on the grapes under appellant's contract was raised to a prohibitory price in order that respondents would not be required to make delivery and would thereby be enabled to put upon the market more of the "Puffed" variety. The witness, Millard S. Bury, assistant to the manager of Sunland Sales Cooperative Association, testified: "Q. Well, I don't know what you did. I will withdraw that. I don't think you made any offer for seeded after that. Well, then, as a matter of fact, this direction sent by you to these four offices, Chicago, Atlanta, San Francisco and Boston, directing your divisional agents to sell the Muscat seeded pack at eleven cents, higher than you were selling the puffed for, was to stimulate the trade in puffed? A. No. More to get in the eyes of the trade, get over in the eyes of the trade, that fact that we still had seeded. That was not to quote them. We did not want to sell seeded particularly. In other words, our major thought was on puffed. Q. Sure. You really did not expect that those experienced men in the east, throughout the country, jobbers and wholesale men, were going to pay you a higher price for an inferior article when they could get a superior article for less price? You did not really expect that, did you? A. *We had hoped that large sales would not be made.* Q. Well, I think that answers it. You had hoped that large sales would not be made. A. Because of the fact, as stated before, we wanted to get general distribution, if possible, full distribution on puffed, because we knew if we put puffed over, as we should, nobody else would have much of a look-in on old style seeded. The demand would be *nil,* which has later resulted." Augmented to this are the prices quoted in bulletins received in evidence issued on

various dates from and after October 21, 1925, to and including December 1, 1925. In these bulletins whenever Puffed Sun-Maid Raisins in fifteen-ounce packages and Package Seeded Muscats Sun-Maid in fifteen-ounce packages are quoted together, the price fixed for the puffed raisins is greater than the price fixed for the "old style" Package Seeded Muscats. The reason for this seems obvious. The puffed raisins were a new product which was considered superior to the old style seeded Muscats and which the Sun-Maid Raisin Growers were then featuring. And yet after the order of appellant was sent in, respondent Sunland Sales Cooperative Association refused to fill the order at the quoted price but made a price at which the seeded Muscat contracted for and ordered by appellant was quoted higher than the higher grade of puffed Muscat.

The purpose of raising the price on appellant's order for seeded Muscat raisins, however, under the view we have taken becomes immaterial, as the sole question presented is the interpretation to be placed upon paragraph three of the contract, which provides: "Buyer shall pay hereunder for 2-crown Loose Muscats per pound the price quoted by Seller on 15-ounce Seeded cartons less four (4¢) cents, with minimum of four and one-half (4½¢) cents per pound; for 3-crown Loose Muscats per pound the price quoted by Seller for 15-ounce Seeded cartons less three (3¢) cents, with a minimum of five and one-half (5½¢) cents per pound. Prices shall be f. o. b. Sellers plant at Fresno or Selma."

Appellant placed the two orders in dispute with respondent Sunland Sales Cooperative Association; the first, November 13, 1925, for sixty tons Muscatel, three-crown loose, lug boxes, and forty tons Muscatel, two-crown loose, lug boxes, and the second, November 17, 1925, for 300 tons Muscat, three-crown loose, lug boxes, and 200 tons Muscat, two-crown loose, lug boxes. Having no quoted price other than that published in the market news or fruit news, the price was left blank and a letter written by Leslie S. Smith, the general manager of appellant corporation, requesting that the proper price be inserted in accordance with the conditions of the contract. These orders were accepted by respondent, Sunland Sales Cooperative Association, on the days following their respective dates, the

first on November 14th and the second on November 18th, and the prices quoted on those dates were filled in both orders, namely, eight cents a pound for three-crown raisins and seven cents a pound for two-crown raisins. On November 14, 1925, Ellsworth Bryce, manager of the sales administration division of Sunland Sales Cooperative Association, sent a night telegram, dated November 14, 1925, to the sales offices at Chicago, Boston, San Francisco and Atlanta as follows: "View of demand certain territories you may offer effective November 14th thirty-six fifteen ounce carton seeded to your trade at a price of eleven cents valley subject to home office confirmation." The number "thirty-six" mentioned means, according to sales manager Bryce, thirty-six cartons to the case of fifteen-ounce seeded.

The question narrows itself to what the parties to the contract intended by the use of the term "price quoted."
█ It is so well established as not to require the citation of authority that contracts are to be construed to give the true intent of the parties and that words are to be given their common and accepted meaning. All of the dictionaries—Webster's, Century, Imperial and Standard—concur that the definition of the term "quoted" is to name or give the current market price. "Market price means the current price" (*Sloan* v. *Baird,* 162 N. Y. 327 [56 N. E. 752, 753]). █ "Market price" and "market value," when applied to any article, mean the same thing. They mean the price or value of the article established or shown by sales in the way of ordinary business (*Sanford* v. *Peck,* 63 Conn. 486 [27 Atl. 1057]; *Murray* v. *Stanton,* 99 Mass. 348; *Cliquot's Champagne,* 70 U. S. (3 Wall.) 114, [18 L. Ed. 116]). "Market value" is the price at which goods are freely offered in the market *to all the world* (*Muser* v. *Magone,* 155 U. S. 240 [39 L. Ed. 135, 15 Sup. Ct. Rep. 77, 81, see, also, Rose's U. S. Notes]). It is clear then that the term "price quoted" in the contract was intended to mean the price quoted in the general market and not in a few particular localities.
█ The last price quoted to the general trade for the fifteen-ounce seeded carton pack when the orders of appellant were accepted was nine cents, and, therefore, respondents in refusing to fill the orders at the quoted price and

not appellant breached the contract. The night telegram to four of the seventeen divisional sales offices did not establish the "price quoted" in accordance with the understanding of the contracting parties as disclosed by the evidence and the contract itself. On the contrary, it appears to be an arbitrary attempt to name a price to fit the situation confronting respondents.

If respondents could establish the price to be paid by appellant for raisins ordered under the contract by wiring a price to four out of the seventeen of the divisional offices, raising the price in these four offices and maintaining the lower price in the remainder, the same result could likewise be accomplished by wiring a price to one of the divisional offices. It is too clear to admit of argument that such was not contemplated by the parties at the time they entered into the contract. The market for raisins was widespread. It covered the United States and Canada as well as foreign lands and, therefore, what was in the minds of the parties at the time of executing the contract was the general market price—not the price which might be confined to one locality. Appellant certainly did not intend by its contract to place the power in the hands of respondents to fix the price to be charged it by respondents naming the price at which raisins might be sold in one of the divisional offices.

Appellant urges that we make findings and direct the entry of judgment in its favor under the authority conferred by section 956a of the Code of Civil Procedure, which provides that the supreme and appellate courts may make findings; but as the trial court under the view it took concluded that appellant was not entitled to damages under any count of the complaint excepting the fifth, alleging a cause of action for money had and received, and upon which it rendered judgment for appellant, and therefore did not consider evidence as to plaintiff's damages by reason of respondents' breach of the contract, we deem it proper that the trial court should hear the evidence as to appellant's damages and determine the same.

The judgment is reversed and the cause remanded, with direction to the trial court to find appellant's damages and enter judgment in accordance with such finding.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 24, 1929, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 23, 1929.

All the Justices present concurred.