[Civ. No. 12895.   Second Dist., Div. Three.   Feb. 24, 1942.]

SOUTHERN PACIFIC MILLING COMPANY (a Corporation), Respondent, v. BILLIWHACK STOCK FARM, LTD. (a Corporation), et al., Appellants.

E. Neal Ames for Appellants.

Schauer, Ryon & McMahon and Charles F. Blackstock for Respondent.

SHAW, J. pro tem.—This is an action for damages for breach of a written contract for the sale of rolled barley by plaintiff to defendant. Plaintiff had judgment, from which defendant appeals. Since the appeal requires us to construe several provisions of the contract, we set it forth here in full:

"Santa Barbara, Calif. Aug. 12th, 1937 (Confirmation) Seller—Southern Pacific Milling Co. Santa Paula, Calif. Purchaser—Billiwhack Stock Farm, Ltd., Santa Paula, Calif. Article—Rolled Barley. Quantity—Two Hundred (200) tons. Quality—Good Field-run Barley. Price—Thirty-four

($34.00) Dollars per ton delivered to purchaser's dairy plant in Alisio Canyon, near Santa Paula, Calif. Shipment—As required in lots of 10 tons or more, during the months of Aug. 1937 to July 31,/38 purchaser to give seller sufficient notice to permit of rolling and making delivery as required. Payments—Purchaser to advance Five Hundred ($500.00) Dollars on Sept. 1st, 37, and . . . Five Hundred ($500.00) Dollars on Oct. 1st, 37, to apply on purchase price of 200 tons rolled barley. It is also understood and agreed that unless the full purchase price is paid on or before November 1st, 1937, an additional carrying charge of Twenty (20¢) cents per ton per month shall be added to the contract price of Thirty-four Dollars per ton; for example, all rolled barley delivered on this contract during month of November will be charged for at rate of Thirty-four and 20/100 ($34.20) Dollars per ton; all deliveries made during month of December will be charged for at rate of Thirty-four and 40/100 ($34.40) Dollars per ton, and so on. Any rolled barley remaining undelivered on this contract on July 31, 1938, will be invoiced to purchaser and is to be paid for immediately at the prices shown above. The Seller is not responsible for nondelivery, or delay of delivery caused by Strikes, Fire, Floods, Droughts, Accidents, Wars, Insurrections, Lockouts or any other contingencies beyond the Seller's control. Seller: S. P. Milling Co., By Lonnie Hobson, Agt. Accepted by: W. G. Schwindt Buyer.''

Defendant made the payments called for by the contract on September 1, 1937, and October 1, 1937, but did not pay the remainder of the price on or before November 1, 1937. Deliveries of rolled barley were made to defendant, on its orders, until about February 23, 1938. The total amount delivered was 205,320 pounds, for all of which defendant made payment. The remainder of the 200 tons mentioned in the contract was never delivered, and plaintiff sued for and has recovered damages on the theory that defendant breached the contract by not taking and paying for that remainder.

The two payments required by this contract on September 1, 1937, and October 1, 1937, cover the price of slightly less than 59,000 pounds of barley, leaving approximately 146,000 pounds of the barley received by the defendant to which the provision for these payments does not apply. The provision for payment on July 31, 1938, applies only to barley then remaining undelivered. The provision regarding payment on

November 1, 1937, does not fix the time for payment of any part of the price; it merely provides for a sliding scale of increases in price, to become effective if payment is not made by the date stated. It gives defendant an option to avoid these price increases by paying in full on or before that date, but it imposes on him no obligation to do so. ▌ The contract is thus entirely silent as to the time for payment of the price of the 146,000 pounds of barley above mentioned, and of any additional amounts which defendant might order for delivery before July 1, 1938. When a contract for the sale of personal property does not fix the time for payment of the price, the law steps in and fixes the time of delivery as the time of payment. (Civ. Code, sec. 1762; *Gilfallan* v. *Gilfallan* (1914), 168 Cal. 23, 29 [141 Pac. 623, Ann. Cas. 1915D, 784]; *Stum* v. *Hadrich* (1907), 7 Cal. App. 241, 243 [94 Pac. 82]; *Romer* v. *Wehner* (1923), 61 Cal. App. 411, 417 [214 Pac. 993].) Where the time for payment of a part only of the price is fixed by the contract, this rule applies to payment of the remainder. (*Gilfallan* v. *Gilfallan, supra,* at p. 30; see also *Stum* v. *Hadrich, supra.*) It should be noted that the provision now in section 1762 of the Civil Code was formerly contained, in substance, in section 1784 of that code; hence the references to section 1784 in the cases cited.

▌ Defendant contends that there was a course of dealing between the parties by which defendant had thirty days' time in which to pay for all purchases, that this course of dealing became a part of the contract, and that when plaintiff demanded cash on delivery it therefore committed a breach of the contract which affords defendant a sufficient defense to this action. Regarding contracts in general, ''It is a well-settled principle that that which is implied by law becomes as much a part of the contract as that which is therein written, and if the contract is clear and complete when aided by that which is imported into it by legal implication, it cannot be contradicted by parol in respect of that which is implied any more than in respect of that which is written.'' (*Standard Box Co.* v. *Mutual Biscuit Co.* (1909), 10 Cal. App. 746, 750 [103 Pac. 938].) This application of the parol evidence rule has been approved and followed in several subsequent cases. See *Calpetro P. Syndicate* v. *C. M. Woods Co.* (1929), 206 Cal. 246, 252 [274 Pac. 65]. ▌ However,

section 1791 of the Civil Code, which is a part of the Uniform Sales Act, adopted in this state in 1931, seems to suggest a possible exception to the parol evidence rule in case of sales, for it provides, in part: "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by . . . the course of dealing between the parties."

The question whether this provision does make an exception to the parol evidence rule as applied by the cases need not be decided here, for on examination of the evidence relating to the supposed course of dealing we find it insufficient to raise that question. The evidence relied upon by defendant on this point came wholly from plaintiff's witness Hobson, who was and had been for several years plaintiff's agent in the territory in which defendant's place of business was situated, and who negotiated the contract for plaintiff. He testified on cross-examination: "Q. Now, Mr. Hobson, Mr. Fratkin—Billiwhack Stock Farm had been purchasing rolled barley from you prior to entering into this contract, had they not? A. I believe they had. I can't say positively, because I don't remember exactly. Q. Didn't you handle the sales to them of rolled barley prior to August 1937? A. Yes. They were buying various things. There could have been rolled barley in that so far as I remember now. Q. And rolled barley and other things were all bought on 30 days time, were they not? A. For rolled barley? Q. Yes. A. It was bought on 30 days time, yes, they were supposed to clear their account every 30 days. Q. Did you have any discussion in regard to payments, the time of payment, at the time when you entered into this contract with Mr. Fratkin? A. They knew at the time it was supposed to be paid." After further questioning had brought out the fact that before the contract was made the witness discussed with two of defendant's agents the time of payment, he testified: "Q. Does the contract contain a statement of the method of payment which was discussed at that time? A. I don't remember. . . . Q. The question was, did you at any time in these conversations tell Mr. Fratkin this grain would be delivered only on cash with delivery, prior to the signing of the contract? A. No." This witness also testified that on February 23, 1938, he insisted on cash payment for barley because defendant's account "wasn't kept up to a 30 day period." We find no further evidence in the record on this subject.

While this evidence may generate a suspicion of a previous course of dealing, it does not fix the time or the commodities covered thereby or enable us to determine whether there was a real course of dealing or were merely occasional purchases each separately agreed on. It is too nebulous and uncertain to justify us in holding, in the face of the trial court's decision adverse to defendant, that there was a prior course of dealing, even if such a course of dealing would become part of the contract.

Insofar as the testimony relates to the handling of the account after the contract was made, it goes no further than to suggest an oral modification of the written contract, as the terms of that contract were fixed by the rule of law above stated. Such a modification of a written contract is effective only to the extent that it is executed, that is, carried out. (Civ. Code, sec. 1698; *Columbia Casualty Co.* v. *Lewis* (1936), 14 Cal. App. (2d) 64, 72 [57 Pac. (2d) 1010]; *Standard Box Co.* v. *Mutual Biscuit Co., supra,* p. 755; *Rottman* v. *Hevener* (1921), 54 Cal. App. 474, 479 [202 Pac. 329].) If there was any oral agreement here to modify the implied terms of the contract regarding the time for payment of the price, obviously that agreement was not executed as to the orders for which plaintiff demanded cash on delivery.

Defendant claims, also, that on or about February 23, 1937, it ordered 10 tons of barley, and that when plaintiff demanded cash on delivery defendant acquiesced in that demand, but that plaintiff did not completely fill this order and thus committed a breach of the contract. The evidence does show that 2 tons of barley were delivered to defendant at this time and paid for on delivery. But we discover no evidence requiring a finding that any more than these 2 tons of barley were ordered on the cash basis and not delivered. Suggestion of a 10-ton order was made in questions asked of plaintiff's witness Hobson on cross-examination, but his answers were that he did not remember such an order. Defendant's witness, after stating that before plaintiff's demand for cash on delivery he gave an order for an unspecified amount, part of which was not delivered, further said: "Q. How many tons had you ordered at that time? A. Well, they usually roll us about 100—about 10 ton at a time. Q. And that was—did you put in an order for about that

much? A. Well, that is about what they would roll us every time I would order it . . . A. Well, after they called and after I called them and they told me it was cash I never did order any more at all." On this testimony the trial court may well have concluded that no barley other than that delivered was ordered on the cash basis.

■ Another contention of defendant is that the contract requires it to order a minimum of 10 tons of barley per month, that when it failed to order any more barley after February, 1937, it at once committed a breach of the contract and the damages should have been fixed as of the time of such breach. This contention is based on the clause of the contract headed "Shipment." We see no sufficient reason for so construing the contract. Had such been the intention it would have been easy so to provide by inserting the words "per month" after the reference to "lots of 10 tons or more," but those words or their equivalent do not appear. Instead the whole clause is introduced by the words "as required," which, with the subsequent provision for notice by the purchaser, give it an option as to the time for delivery and the amount thereof, limited only by the statement of the period of time in which this may be done, and by the specified minimum for a single order.

■ The evidence shows that on July 31, 1938, the plaintiff did not have on hand for delivery under the contract an amount of rolled barley equal to that then remaining undelivered, that plaintiff made no tender of barley to defendant on that date, and that this undelivered barley was never "invoiced to the purchaser," as the contract provides. Defendant contends that by reason of these omissions on plaintiff's part it cannot recover. But the evidence shows that on July 31, 1938, Upton, the plaintiff's agent, had a conversation with Fratkin, representing the defendant, in which, as Upton testified, "I asked Mr. Fratkin if they expected to take delivery of the undelivered balance of the contract, and he stated to me that they didn't intend to, and I asked him why, and he said because we had refused delivery without the cash. . . . I told him that I was supposed to collect the account." This constituted an unequivocal refusal by defendant, made at a time when plaintiff was not in default, and not later withdrawn, to proceed further in performance of the contract, and excused plaintiff from the necessity it might otherwise have been under to make a tender of the barley and invoice

it. (Civ. Code, sec. 1440; *Cossins* v. *Hershell etc. Co.* (1930), 103 Cal. App. 524, 529 [284 Pac. 1038].) Such refusal does not relieve the plaintiff from the requirement that in order to recover it must have been able to perform on its part. (*Dickey* v. *Kuhn* (1930), 106 Cal. App. 300, 304 [289 Pac. 242].) But such ability appeared here. While plaintiff did not have the necessary amount of rolled barley on hand on July 31, it did have that quantity of unrolled barley and the necessary machinery for rolling it and could have rolled and delivered the barley if defendant had been willing to accept it. The evidence shows that such a quantity of barley cannot be rolled and kept for any considerable time because of its tendency to spoil, and the contract allows plaintiff sufficient time for rolling after the barley is required.

Finally, defendant contends that the evidence does not support the finding of damages, and this contention must be sustained. In discussing this point defendant erroneously assumes that the measure of damages here is fixed by section 3353 of the Civil Code. That section declares what is ''the value of property to a seller'' in estimating damages, and prior to the adoption of the Uniform Sales Act in this state in 1931, section 3311 of the Civil Code, which then fixed the measure of damages in such a case as we have here, adopted ''the value to the seller'' as one of the factors to be used in estimating such damages. But in 1931 section 3311 was repealed, and the Uniform Sales Act was adopted, and the matter is now covered by section 1784 of the Civil Code, adopted as part of that act. Respondent contends that the applicable part of this section is subdivision (3) thereof, which provides that ''Where there is an available market for the goods in question, the measure of damages is . . . the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted.'' The evidence does not suggest that any other part of section 1784 is to be considered. The only evidence on the subject is the hereinafter stated testimony of plaintiff's witness Furman. After testifying that he was familiar with the market value of rolled barley delivered in quantities of 10 tons or more in the Santa Paula area (defendant's place of business was in that area) on July 31, 1938, and that this market price was $23 per ton, he continued: ''Q. How do you arrive at that price, Mr. Furman? A. Because on that date the barley market, the barley was selling and was worth

90 cents a hundred in the valley where it was grown, Santa Inez. Santa Inez is a section where we buy our barley. We add 10 cents transportation and 10 cents for rolling, a dollar a ton profit, that makes an aggregate of $23.'' On cross-examination he said that the price he added for rolling included a profit of about 75 cents per ton. The witness' first general statement of market price here can have no greater force or effect, even on appeal, than his immediately ensuing explanation of its meaning. According to the explanation, it merely states what would have been the cost to plaintiff at the time in question of buying whole barley elsewhere, rolling it and transporting it to Santa Paula, with a profit added. What the statute calls for is "the market or current price." " 'Market price' and 'market value,' when applied to any article, mean the same thing. They mean the price or value of the article established or shown by sales in the way of ordinary business. . . . 'Market value' is the price at which goods are freely offered in the market *to all the world.*" (*Kings Co. Packing Co.* v. *Sunland Sales Coop. Ass'n* (1929), 100 Cal. App. 126, 133 [279 Pac. 1036]—emphasis by the court.) The evidence quoted does not show that there was an available market, or that there was a current or market price for rolled barley at the time and place of the breach. In the absence of all these factors, section 1784 Civil Code provides other rules for estimating damages, but there is no evidence by which they can be applied.

However, since we find no error affecting the determination of defendant's liability for damages, only the issue of damages need be retried following the reversal which must be ordered.

The judgment is reversed with directions to the superior court to retry the issue of plaintiff's damages only, all the present findings on other issues to stand, and thereupon to enter judgment in plaintiff's favor for such amount of damages as it may find plaintiff to have suffered by the defendant's breach of contract.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied March 24, 1942.