[Civ. No. 23343. First Dist., Div. One. Jan. 30, 1967.]

SHELDON SACKETT, Plaintiff, Cross-defendant and Appellant, v. PAUL R. SPINDLER, Defendant, Cross-complainant and Respondent.

Vincent Hallinan, Carl B. Shapiro, Patrick Sarsfield Hallinan and LeRoy W. Rice for Plaintiff, Cross-defendant and Appellant.

Kahle, Adams & Everton and Douglass M. Adams for Defendant, Cross-complainant and Respondent.

MOLINARI, P. J.—Plaintiff and cross-defendant, Sheldon Sackett, appeals from the judgment of the trial court determining that he take nothing on his complaint for money had and received and further awarding defendant and cross-complainant, Paul Spindler, $34,575.74 plus interest on his cross-complaint against Sackett for breach of contract. Sackett's contentions on appeal are as follows: (1) the evidence reveals no ''actionable breach'' on his part; (2) damages were incor-

rectly computed; (3) certain evidence was improperly excluded; (4) the trial court's findings as to mitigation of damages by Spindler are not supported by the evidence; and (5) the trial court erred in awarding interest to Spindler.

## The Record

As of July 8, 1961 Spindler was the owner of a majority of the shares of S & S Newspapers, a corporation which, since April 1, 1959, had owned and operated a newspaper in Santa Clara known as the Santa Clara Journal. In addition, Spindler, as president of S & S Newspapers, served as publisher, editor, and general manager of the Journal. On July 8, 1961[1] Spindler entered into a written agreement with Sackett whereby the latter agreed to purchase 6,316 shares of stock in S & S Newspapers, this number representing the total number of shares outstanding. The contract provided for a total purchase price of $85,000 payable as follows: $6,000 on or before July 10, $20,000 on or before July 14, and $59,000 on or before August 15. In addition the agreement obligated Sackett to pay interest at the rate of 6 percent on any unpaid balance. And finally, the contract provided for delivery of the full amount of stock to Sackett free of encumbrances when he made his final payment under the contract.

Sackett paid the initial $6,000 installment on time and made an additional $19,800 payment on July 21. On August 10 Sackett gave Spindler a check for the $59,200 balance due under the contract; however, due to the fact that the account on which this check was drawn contained insufficient funds to cover the check, the check was never paid. Meanwhile, however, Spindler had acquired the stock owned by the minority shareholders of S & S Newspapers, had endorsed the stock certificates, and had given all but 454 shares to Sackett's attorneys to hold in escrow until Sackett had paid Spindler the $59,200 balance due under the contract. However, on September 1, after the $59,200 check had not cleared, Spindler reclaimed the stock certificates held by Sackett's attorney.

Thereafter, on September 12 Spindler received a telegram from Sackett to the effect that the latter "had secured payments our transaction and was ready, willing and eager to transfer them" and that Sackett's new attorney would contact Spindler's attorney. In response to this telegram Spindler, by return telegram, gave Sackett the name of Spindler's attorney. Subsequently, Sackett's attorney contacted Spind-

---

[1] Unless otherwise indicated, all dates refer to the year 1961.

ler's attorney and arranged a meeting to discuss Sackett's performance of the contract. At this meeting, which was held on September 19 at the office of Sackett's attorney, in response to Sackett's representation that he would be able to pay Spindler the balance due under the contract by September 22, Spindler served Sackett with a notice to the effect that unless the latter paid the $59,200 balance due under the contract plus interest by that date, Spindler would not consider completing the sale and would assess damages for Sackett's breach of the agreement. Also discussed at this meeting was the newspaper's urgent need for working capital. Pursuant to this discussion Sackett on the same date paid Spindler $3,944.26 as an advance for working capital. However, Sackett failed to make any further payments or to communicate with Spindler by September 22, and on that date the latter, by letter addressed to Sackett, again extended the time for Sackett's performance until September 29. Again Sackett failed to tender the amount owing under the contract or to contact Spindler by that date, the next communication between the parties occurring on October 4 in the form of a telegram by which Sackett advised Spindler that Sackett's assets were now free as a result of the fact that his wife's petition to impress a receivership on his assets had been dismissed by the trial court in which divorce proceedings between Sackett and his wife were pending; that he was "ready, eager and willing to proceed to . . . consummate all details of our previously settled sale and purchase"; and that the decision of the trial court dismissing his wife's petition for receivership "will clear way shortly for full financing any unpaid balance." Accordingly, Sackett, in this telegram, urged Spindler to have his attorney contact Sackett's attorney "regarding any unfinished details." In response to this telegram Spindler's attorney, on October 5, wrote a letter to Sackett's attorney stating that as a result of Sackett's delay in performing the contract and his unwillingness to consummate the agreement, "there will be no sale and purchase of the stock. . . ." Following this letter Sackett's attorney, on October 6, telephoned Spindler's attorney and offered to pay the balance due under the contract over a period of time through a "liquidating trust." This proposal was rejected by Spindler's attorney, who, however, informed Sackett's attorney at that time that Spindler was still willing to consummate the sale of the stock provided Sackett would pay the balance in cash or its equivalent. No tender or offer of cash or its

equivalent was made and Sackett thereafter failed to communicate with Spindler until shortly before the commencement of this action.

Beginning during the period scheduled for Sackett's performance of the contract Spindler found it increasingly difficult to operate the paper at a profit, particularly due to the lack of adequate working capital. In an attempt to remedy this situation Spindler obtained a loan of approximately $4,000 by mortgaging various items of personal property owned by him. In addition, in November, Spindler sold half of his stock in S & S Newspapers for $10,000. Thereafter, in December, in an effort to minimize the cost of operating the newspaper, Spindler converted the paper from a daily to a weekly. Finally, in July 1962 Spindler repurchased for $10,000 the stock which he had sold the previous November and sold the full 6,316 shares for $22,000, which sale netted Spindler $20,680 after payment of brokerage commission.

## Breach of Contract

Sackett contends that the evidence reveals no "actionable breach" on his part. The basis of his argument is that despite his failure to tender over half of the purchase price for the stock of S & S Newspapers, his duty to consummate the contract was discharged by Spindler's conduct in two respects, namely, Spindler's "rescission" of the purchase agreement as a result of his reclamation of the stock certificates from Sackett's attorney on September 1 and Spindler's "repudiation" of the contract on October 5.

To begin with, the undisputed evidence shows that of the $85,000 due from Sackett to Spindler under the purchase agreement the total amount which the former paid to the latter up to the time of trial was $29,744.26. Moreover, the purchase agreement reveals that Sackett's promise to pay Spindler $85,000 was an unconditional one once the respective dates on which the payments were due had arrived. Accordingly, since the trial court found that it was not impossible for Sackett to perform the subject contract either by virtue of his illness and hospitalization or his pending divorce litigation, it is clear that his failure to tender the balance due under the contract constituted a breach of the agreement, a breach being defined as an unjustified or unexcused failure to perform all or any part of what is promised in a contract. (Rest., Contracts, §§ 312, 314, pp. 462, 465.) The question remains, therefore, as to whether Sackett's duty to consummate the contract

or to respond to Spindler in damages for the former's failure to perform the subject contract was in any way discharged by Spindler's conduct.

With regard first to Spindler's reclaiming of the stock which he had previously delivered to Sackett's attorney to hold in escrow until Sackett paid the balance due under the contract, Sackett argues that under the Uniform Stock Transfer Act (Corp. Code, §§ 2450 through 2486), which was in effect at the time of the transactions involved in this action,[2] Spindler's delivery of the endorsed shares of stock to Sackett's attorney served to transfer title to these shares (Corp. Code, § 2466), and that by subsequently reclaiming the shares of stock Spindler effected a rescission of the purchase agreement and thus barred himself from being able to recover damages for Sackett's breach of the contract.

█ In response to this contention we note initially that although former Corporations Code, section 2466 provided that "Title to a certificate and to the shares represented thereby can be transferred . . . (a) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby," it is apparent that delivery of such endorsed stock certificates into escrow does not constitute a transfer of title to the stock within the purview of this section. █ Moreover, even if such delivery did constitute a transfer of title to the stock, a subsequent reclaiming of the stock certificates would not work a rescission of the contract pursuant to which the stock certificates were delivered into escrow. The procedure by which a unilateral rescission of a contract is effected is set forth in Civil Code, section 1691, as follows: ". . . to effect a rescission a party to the contract must promptly . . . (a) Give notice of rescission to the party as to whom he rescinds; and (b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise. . . ." Spindler did neither of these acts in connection with his withdrawal of the stock certificates from escrow on September 1. Rather, even after that date he continued to affirm the contract and to urge Sackett to perform it. Thus, it is clear that Spindler neither intended to rescind the contract as of September 1 nor took any action

[2]These sections were repealed as of January 1, 1965.

which could effect such a rescission.[3] ■■■ Secondly, with regard to Sackett's claim that Spindler "repudiated" the contract on October 5, it is clear that the letter which Spindler's attorney wrote to Sackett's attorney on that date informing the latter that as a result of the "many delays" on the part of Sackett "there will be no sale and purchase of the [newspaper] stock" constituted notification to Sackett that Spindler considered his own duty of performance under the contract discharged as a result of Sackett's breach of the contract and that Spindler was thereby terminating the contract and substituting his legal remedies for his contractual rights. Such action was justifiable on Spindler's part if, but only if, Sackett's breach could properly be classified as a total, rather than a partial, breach of the contract. (Rest., Contracts, § 313, p. 464; 4 Corbin on Contracts, § 946, p. 809.) If, on the other hand, Sackett's breach at that time was not total so that Spindler was not entitled to consider himself discharged under the contract, then Spindler's action would constitute an unlawful repudiation of the contract, which would in turn be a total breach of the contract sufficient to discharge Sackett from any further duty to perform the contract. (6 Corbin on Contracts, § 1253, pp. 7, 13-16.)

■■■ Whether a breach of contract is total or partial depends upon its materiality. (Rest., Contracts, § 317, p. 471.) In determining the materiality of a failure to fully perform a promise the following factors are to be considered: (1) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated; (2) the extent to which the injured party may be adequately compensated in damages for lack of complete performance; (3) the extent to which the party failing to perform has already partly performed or made preparations for performance; (4) the greater or less hardship on the party failing to perform in terminating the contract; (5) the wilful, negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract. (Rest., Contracts, § 275, pp. 402-403.) ■■■ In the instant case, although

---

[3]In this regard, we note the case of *Porter* v. *Gibson*, 25 Cal.2d 506, 515-516 [154 P.2d 703], where the seller of stock was allowed to maintain an action against the buyer for the price of the stock after the seller had withdrawn the stock certificates from escrow upon the buyer's failure to pay the balance due under the agreement of purchase. No mention is made in that case of any rescission taking place as a result of the seller's withdrawing the stock certificates from escrow.

Sackett had paid part of the purchase price for the newspaper stock and although his delay in paying the balance due under the contract could probably be compensated for in damages, we are of the opinion that Spindler was justified in terminating the contract on October 5 on the basis that despite Sackett's ''offers'' to perform and his assurances to Spindler that he would perform, it was extremely uncertain as to whether in fact Sackett intended to complete the contract. In addition, in light of Spindler's numerous requests of Sackett for the balance due under the contract, the latter's failure to perform could certainly not be characterized as innocent; rather it could be but ascribed to gross negligence or wilful conduct on his part.

The facts in the instant case are similar to those in *Coughlin* v. *Blair*, 41 Cal.2d 587 [262 P.2d 305]. There the plaintiffs purchased a lot from the defendants, who, in the deposit receipt evidencing the sale, agreed to install utilities and to pave the road to the subject lot within one year from the date of the agreement. On May 30, 1949, the date that performance was due under the contract, the utilities had not been installed nor had the road been paved. During the following year the plaintiffs wrote several letters to the defendants demanding performance. The defendants, however, did not perform their obligations nor did they repudiate the contract. Ultimately, on May 24, 1950, the work still not having been done, the plaintiffs brought an action for general damages based on the difference in value of the property with and without the performance promised in the contract and for special damages. In affirming the judgment of the trial court insofar as it awarded the plaintiffs general damages, the Supreme Court considered whether, in view of the defendants' assertion that they intended to perform their obligations under the contract in the future, the trial court's award of damages to the plaintiffs allowed them a double recovery, that is, both the improvements and damages for failure to secure the improvements. In this context the Supreme Court pointed out that if the defendants' breach was total, the plaintiffs could recover all their damages, past and prospective, in one action and that a judgment for the plaintiffs in such an action would absolve the defendants from any duty to perform the contract. The Supreme Court then proceeded to consider whether the plaintiffs were entitled to treat the defendants' breach as total as of the date of the commencement of the action and concluded that ''Although defendants had not expressly repudiated the con-

tract, their conduct clearly justified plaintiffs' belief that performance was either unlikely or would be forthcoming only when it suited defendants' convenience." Under these circumstances it was held that the plaintiffs were not required to endure that uncertainty or to await the defendants' convenience but were justified in treating the defendants' nonperformance as a total breach of the contract. (Pp. 599-600; see also *Gold Min. & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 29-30 [142 P.2d 22]; *Walker* v. *Harbor Business Blocks Co.*, 181 Cal. 773, 780-781 [186 P. 356].)

Similarly, in the instant case although Sackett at no time repudiated the contract and although he frequently expressed willingness to perform, the evidence was such as to warrant the inference that he did not intend to perform the subject contract. Certainly, the state of the record was such as to justify the conclusion either that it was unlikely that Sackett would tender the balance due or that he would do so at his own convenience. Spindler was not required to endure the uncertainty or to await Sackett's convenience and was therefore justified in treating the latter's nonperformance as a total breach of the contract. Accordingly, we conclude that the letter which Spindler's attorney wrote to Sackett's attorney on October 5 did not constitute an unlawful repudiation of the contract on Spindler's part, was therefore not a breach of the contract by him, and thus did not discharge Sackett's duty to perform the contract or, alternatively, to respond to Spindler in damages.

In any event, even if Spindler was not justified in treating Sackett's breach as total as of October 5, the latter's contention that his duty to perform was discharged by Spindler's repudiation of the contract as of that date is untenable. Since Spindler was not obligated to perform his promise at that time due to Sackett's failure to tender the balance due under the contract, Spindler's repudiation was, at best, anticipatory in nature. Its effect was nullified by Sackett's disregard of it and his treating the contract as still in force as evidenced by his attempt, through his attorney, to arrange an alternative method of financing the balance due under the agreement. (See *Cook* v. *Nordstrand*, 83 Cal.App.2d 188, 195 [188 P.2d 282]; Rest., Contracts, § 319, p. 481.) Moreover, Spindler's repudiation was itself retracted by his attorney who, on Spindler's behalf, told Sackett's attorney in the same conversation at which the latter suggested an alternative method of financing that Spindler was still willing to consum-

mate the sale provided Sackett would pay the balance due in cash or its equivalent. Such a retraction constitutes a nullification of the original effectiveness of the repudiation. (Rest., Contracts, § 319, p. 481.)

### Measure of Damages

As revealed in the findings of fact in the instant case, the $34,575.74 award of damages to Spindler was calculated by subtracting from the $85,000 contract price all sums of money received by him from Sackett ($29,744.26) and Spindler's net proceeds from his subsequent sale of the stock in July 1962 ($20,680). Sackett contends that the trial court erred in measuring damages by the difference between the contract price for the stock and the price at which Spindler ultimately resold the stock to a third party and that the proper measure of damages in the instant case should instead have been the difference between the price which Sackett agreed to pay for the stock and its value at the date of the breach. In addition, Sackett argues that even assuming the trial court used the correct measure of damages it erred in its computation of damages under this measure. In this regard he contends that since, under his contract with Spindler, he not only agreed to pay Spindler $85,000 but also agreed to assume the liabilities of the newspaper, which at the time of the agreement amounted to $201,849.33, and since under Spindler's sale of the stock in 1962 the buyer was also to assume the newspaper's liabilities, which at that time were approximately $219,844.63, the increase in liabilities during this interval, i.e., $17,995.30, constituted "gross income" to Spindler and "should have been deducted from the judgment as money which had been received by the seller." We concern ourselves initially with the question of what measure of damages was appropriate in the instant case.

Sackett concedes that under the holding of *Porter* v. *Gibson* (1944) 25 Cal.2d 506, 511-514 [154 P.2d 703], the provisions of the Uniform Sales Act (Civ. Code, §§ 1721-1800),[4] which was in effect at the time of the subject transaction, are not applicable to a sale of corporate stock.[5] (See also *Franck* v. *J. J. Sugarman-Rudolph Co.* (1952) 40 Cal.2d 81, 87-88 [251 P.2d 949].) ■ Accordingly, section 1784 of the Uniform Sales Act providing that the seller's measure of damages for the buyer's breach of a contract to purchase goods is the

---

[4] All statutory references hereinafter made are to the Civil Code.

[5] The Uniform Sales Act was replaced on January 1, 1963 by the Commercial Code—Sales (Com. Code, §§ 2101-2724, incl.).

difference between the contract price and the market price at the time of the breach is not applicable in the instant case. While under the holding of the *Porter* case the provisions of the Uniform Sales Act are not applicable to a sale of corporate stock, that case, in holding that upon the vendee's breach of a contract to purchase stock when the title to it had passed the vendor may retain the stock for the vendee and sue for the purchase price, applied the law applicable to sales of personal property as that law is articulated in *Cuthill* v. *Peabody* (1912) 19 Cal.App. 304 [125 P. 926]. Moreover, since the principles of the *Cuthill* case, as applied by *Porter,* were approved in *Franck,* we deem them applicable here.

The *Cuthill* case, decided prior to the adoption of the Uniform Sales Act, was an action by the vendor of shares of stock against the vendee to recover the purchase price of the stock, which the vendee had contracted to purchase. In considering whether such a remedy was available to the vendee, the appellate court applied to sales of corporate stock the provisions of the Civil Code and rules of law in cases dealing with personal property, as those rules existed before the adoption of the Sales Act. Based upon those principles, the court in *Cuthill* concluded that since the title to the stock had passed, the vendor could sue for the purchase price. ▆ However, in its opinion, the court articulated the rule that where title to corporate stock has not passed, the vendor, upon the refusal of the vendee to accept the stock and pay the agreed price therefor, cannot sue for the purchase price but is compelled to recoup his loss, if any, solely by an action for damages founded upon a breach of the vendee's contract to accept and pay for the property. (P. 308.) In this regard, *Cuthill* noted that the applicable remedy, under the general rule, is that ''The vendor may treat and keep the property as his own, and recover from the vendee the difference between the contract price and the market price at the time and place of delivery [citations].'' (P. 308.)

*Cuthill,* suggests, by a mere citation of section 3311 which was then in force, and without any discussion of the applicability of that section, that the applicable remedy, upon the vendee's breach of a contract for the purchase of property to which title has not passed, is that provided for in that statute. Section 3311 provided, essentially, that the measure of damages for the buyer's breach of a contract to accept and pay for personal property where title was not vested in the purchaser and the property was not resold in the manner

234

provided by section 3049[6] is the difference between the price which the purchaser agreed to pay and the value of the property to the seller. That section was qualified by section 3353, which provided that the value of the property to a seller is deemed to be the price obtainable therefor in the market nearest to the place at which the property should have been accepted by the buyer and at such time after the breach of the contract as would have sufficed, with reasonable diligence, for the seller to effect a resale.[7] (See *Willson* v. *Gregory*, 2 Cal.App. 312, 314 [84 P. 356]; *Meyer* v. *McAllister*, 24 Cal. App. 16, 17 [140 P. 42]; *Lillie* v. *Weyl-Zucherman & Co.*, 45 Cal.App. 607, 610 [188 P. 619]; *California P. G. Assn.* v. *Herspring*, 60 Cal.App. 503, 511-512 [213 P. 518]; *Hill* v. *McKay*, 94 Cal. 5, 17-18 [29 P. 406]; *Hewes* v. *Germain Fruit Co.*, 106 Cal. 441, 446-447 [39 P. 853]; and see *Royer* v. *Carter* (1951) 37 Cal.2d 544, 549 [233 P.2d 539].)

In 1931 when the Legislature adopted the Uniform Sales Act, it repealed section 3311. Section 3353, however, was retained and still remains in the Civil Code. In *Royer,* which was an action for breach of a contract to purchase realty, section 3353 was held to be inapplicable to real property on the basis that its language suggests that it is limited to sales of personal property. Accordingly, the Supreme Court concluded that since section 3353 has no application to the sales of real property, the applicable rule in cases involving sales of real property, in the light of the provisions of section 3307,[8] was the general rule which required that damages be computed as of the date of the breach of the agreement to purchase the property. (Pp. 549-550.) In *Honey* v. *Henry's Franchise Leasing Corp.* (1966) 64 Cal.2d 801 [52 Cal.Rptr. 18, 415 P.2d 833], a case involving a contract to purchase real and personal property, the Supreme Court, although it sent the case back to the lower court for retrial on the issue of damages because the vendor repossessed some of the property before trial and it was "'impossible to determine from the

---

[6]Section 3049, which was also repealed in 1931, provided for a special lien in favor of a seller of personal property, which lien could be enforced in the same manner as if the property were pledged to him for the price.

[7]Section 3353, enacted in 1872 and never amended, provides as follows: ''In estimating damages, the value of property to a seller thereof is deemed to be the price which he could have obtained therefor in the market nearest to the place at which it should have been accepted by the buyer, and at such time after the breach of the contract as would have sufficed, with reasonable diligence, for the seller to effect a resale.''

[8]Section 3307 provides that ''The detriment caused by the breach of an agreement to purchase an estate in real property, is deemed to be the excess, if any, of the amount which would have been due to the seller, under the contract, over the value of the property to him.''

record whether the value of all the property at the time of the trial was equal to its value at the time of the breach plus any consequential damages that may have been incurred'' (p. 805), reiterated the rule of the *Royer* case and the interpretation which it had, in that case, placed on section 3307. We note, moreover, that while *Honey* involved both real and personal property, and while its holding turned essentially on the interpretation of section 3307, which applies only to real property, the Supreme Court in that case made no distinction between real and personal property.

The *Royer* case, moreover, specifically noted that section 3353 was invoked by the courts before the adoption of the Uniform Sales Act to define the term ''value to the seller'' as used in former section 3311. Although section 3353 is still extant and has now been specifically restricted to cases involving personal property, it is doubtful that it now has any efficacy in view of the repeal of section 3311, which section it was intended to qualify. Since section 3353 comes into play when the ''value of property to a seller'' is to be utilized in estimating damages, it would have no applicability to personalty which came within the purview of the Uniform Sales Act, the measure of damages for the buyer's breach of a contract to purchase goods under section 1784 being the difference between the contract price and the market price at the time of the breach.[9] We conclude, therefore, that insofar as corporate stock is concerned we are, by virtue of the repeal of section 3311, relegated to the general rule articulated in *Cuthill* that where title to the stock has not passed, the measure of damages for breach of a contract to accept and pay for the stock is the difference between the contract price and the market price at the time and place of delivery.

■ It is the general rule, both under the Uniform Sales Act and apart from it, that where the title to goods has not passed to the buyer and the seller has the property in his possession or under his control, the measure of damages upon the buyer's refusal to accept and pay for goods for which there is an available market is, in the absence of special circumstances, the difference between the contract price and the market or current price or value at the time and the place where the goods ought to have been delivered and accepted, or, if no time is fixed for acceptance, then at the time of the refusal to accept. (78 C.J.S. Sales, § 478, p. 137; see *Southern*

[9] This measure of damages is essentially the same as that now contained in Commercial Code, section 2708.

*Pac. Mill Co.* v. *Billiwhack etc. Farm* (1942) 50 Cal.App.2d 79, 87 [122 P.2d 650].) As used in this measure, the words "market price" and "market value" mean the same thing, that is, the price or value of the article as established or shown by sales in the way of ordinary business; the price at which goods are freely offered in the market to all the world. (*Southern Pac. Mill Co.* v. *Billiwhack etc. Farm, supra*, p. 88; *Kings County Packing Co.* v. *Sunland Sales etc. Assn.* (1929) 100 Cal.App. 126, 133 [279 P. 1036]; 78 C.J.S., *supra*, p. 138.)

The above-stated measure of damages, however, does not ordinarily apply when there is no market available at the time and place of performance. In such cases resort may be had to the market value of the goods at the nearest available market; and in the absence of an available market, it has been held that the measure of damages may be the difference between the contract price and the value of the goods as best as can be ascertained, or the difference between the contract price and the best offer that can be obtained for the goods, or the difference between the contract price and the price obtained on a resale, or the actual damages naturally and directly resulting from the buyer's breach. (78 C.J.S., *supra*, § 478(c) and cases cited; and see *Los Angeles Coin-O-Matic Laundries* v. *Harow*, 195 Cal.App.2d 324, 331-335 [15 Cal.Rptr. 693]; and see subd. (2) of former § 1784 and Com. Code, § 2708.) Moreover, even where there is an available market, "The general rule that the measure of damages is the difference between the contract price and the market value is not a hard-and-fast rule, but may be varied if circumstances require it; and it will not be followed where a better method of measuring loss or damages is available under the circumstances." (78 C.J.S., *supra*, p. 138; see subd. (3) of former § 1784; Com. Code, § 2708; and see *Los Angeles Coin-O-Matic Laundries* v. *Harow, supra*.)

██ It is apparent from the foregoing principles that the measure of damages applied by the trial court in the instant case, namely, the difference between the contract price and the net amount of $20,680 received by Spindler from the resale in July 1962, was proper under the circumstances of this case since the record contains evidence from which the trial court could properly conclude that there was no available market for the stock at the time of Sackett's breach. We refer to the testimony of Joseph Snyder, a newspaper broker, to the effect that because the prospective sale of the newspaper by Spindler to Sackett had been publicized in the local newspaper, the former would have great difficulty making a resale

of the newspaper after the latter's failure to consummate the purchase agrement, and that Spindler was in fact extremely fortunate to sell his stock in July 1962. In view of this evidence which tends to show the unavailability of a market for the stock at the time of the breach, we conclude that the trial court was entitled to use the resale price in determining Spindler's damages. Finally, we need not consider whether the trial court, in using the resale price to measure Spindler's damages, should have valued the stock after the breach at $20,000 based upon the sale which Spindler made of one-half of the stock for $10,000 in November 1961. The fact that the trial court used the ultimate net sale price of $20,680 to determine the value of the stock served only to benefit Sackett since a comparison of these two figures show that the value of the stock had increased by the time of the second sale.

 Having concluded that the trial court applied the correct measure of damages in the instant case, we consider Sackett's argument that in computing damages under this measure the trial court should have taken into consideration the fact that the liabilities of the newspaper increased some $17,995.30 during the one-year period between the time he agreed to purchase Spindler's stock and the sale of the stock which the latter ultimately effected. This contention is without merit for the reason that both agreements of sale involved an exchange of the stock of S & S Newspapers for a fixed amount of money, in the one case $85,000 and in the other $22,000. The newspaper's liabilities at each of these times, or more properly the relationship of its liabilities to its assets, was obviously a primary factor in determining the amount which each buyer was willing to pay for the stock and was thus reflected in the contract price of the stock at each date. To this extent the increase in the newspaper's liabilities was necessarily and properly considered by the trial court in awarding damages to Spindler. Any separate or additional consideration by the trial court of the increase in liabilities would have been improper.

### Evidence As to the Value of the Stock at the Date of Breach

 Based upon his contention that the proper measure of damages in the instant case should have been the difference between the contract price for the stock and the value of the stock at the date of breach, Sackett contends that the trial court erred in excluding evidence concerning the value of the stock as of the date of breach. The evidence which Sackett

claims the court erroneously excluded was not directed to the value of the stock as of the date of the breach, but, rather, to the value of the business as of October 5. This evidence was sought to be elicited from Spindler on cross-examination. The record discloses that Spindler, when queried as to the value of the business as of October 5, testified that he did not know its value as of that date, but that it was less than the $85,000 which Sackett had agreed to pay. The objection which the trial court sustained was to an argumentative question by Sackett's counsel as to whether Spindler agreed with Snyder's testimony that the value of a weekly newspaper was the annual gross of the business. The objection was sustained on the ground that the question assumed a fact not in evidence on the basis that Snyder had not so testified. Although the colloquy which followed between court and counsel elicited a statement from the court that it deemed the value of the business two or three weeks after July 8, the date of the sale, as immaterial, the record is unclear as to whether the trial court understood that Sackett's counsel was attempting to show by his argumentative question the value of the stock as of the date of the breach. While the subject was not pursued after the colloquy, we cannot say from a perusal of the record that the trial court foreclosed Sackett's counsel from making the showing he now asserts he was precluded from making.

### Mitigation of Damages

The trial court specifically found that Spindler "spent all reasonable efforts in minimizing damages to plaintiff . . ." and that "The diminution in value of the 'S & S Newspapers' ' business after September 9, 1961 and the consequent diminution in value of the corporate stock in 'S & S Newspapers' after September 9, 1961 was directly caused by the conduct of plaintiff . . . in breaching the aforesaid contract of July 8, 1961 and plaintiff['s] . . . failure to pay to defendant . . . the entire purchase price on or before October 5, 1961." Sackett contends that these findings are not supported by the evidence.

It is well established in California that a party injured by a breach of contract is required to do everything reasonably possible to minimize his own loss and thus reduce the damages for which the other party has become liable. (*Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, 844 [147 P.2d 558]; *Johnson* v. *Comptoir etc. D'Exportation*, 135 Cal.App.2d 683, 689 [288 P.2d 151]; *Hunter* v. *Croysdill*, 169 Cal.App.2d 307, 318 [337 P.2d 174].) From this rule it follows that a person

who has been injured by a breach of contract cannot recover damages for detriment which he could have avoided by reasonable effort and without undue expense. (*Hunter* v. *Croysdill, supra*; *Murphy* v. *Kelly*, 137 Cal.App.2d 21, 31 [289 P.2d 565] ; *Valencia* v. *Shell Oil Co., supra*.) ▆▆ The question of whether the injured party has acted reasonably in mitigating damages is one of fact. (*Jegen* v. *Berger*, 77 Cal.App.2d 1, 11 [174 P.2d 489].) Accordingly, where, as in the instant case, the trial court has made findings of fact to the effect that the injured party has acted reasonably in minimizing his damages, this finding must be upheld on appeal if the record contains any substantial evidence in support of such finding.

▆▆ In the instant case it is clear that the record contains ample evidence tending to show that Spindler acted reasonably in minimizing damages. Firstly, in order to improve the financial condition of the newspaper he made several efforts to raise working capital for the business. This he did by personally borrowing money for additional capital and by selling one-half of his stock. In addition, he cut costs by changing the newspaper from a daily to a weekly paper. Sackett argues that after Spindler had determined that Sackett had breached the contract, Spindler did not list the newspaper for sale with a broker nor did he take any other steps to sell the newspaper. However, according to Snyder's testimony, such action on the part of Spindler would have been futile since it would be almost impossible for him to sell the newspaper after the publicized sale to Sackett had fallen through. In addition, since the record reveals that the financial condition of the newspaper immediately after Sackett's breach was worse than its financial condition approximately one year later, it is apparent that Spindler's damages would have been greater if he had been able to sell the stock at an earlier date. Finally, Sackett contends that Spindler was required to accept Sackett's so-called ''offer'' of October 4 in order to minimize damages. However, Sackett's telegram of October 4 contained no tender of performance, but only an expression of willingness to proceed to consummate the sale as soon as the release of his assets from threatened receivership in his divorce action would permit ''full financing'' of the unpaid balance.

### The Propriety of the Interest Award

In addition to awarding Spindler damages in the amount of $34,575.74, the trial court awarded him interest on that sum

at 6 percent from September 29 to the date of entry of judg-ment. Sackett contends that this award of interest was error. With this contention we agree. Section 3287 provides for the inclusion of interest in an award of damages as follows: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. . . ." (See *Axell* v. *Axell*, 114 Cal.App.2d 248, 255-256 [250 P.2d 182].)

In *Maurice L. Bein, Inc.* v. *Housing Authority*, 157 Cal. App.2d 670, 686 [321 P.2d 753], the applicable principle is stated as follows: "As a general rule interest in the form of damages is not allowed prior to rendition of judgment on an unliquidated claim or on the amount of a demand which cannot be ascertained either from the face of the contract or by reference to a well-established market value." (See also *Tomlinson* v. *Wander Seed & Bulb Co.*, 177 Cal.App.2d 462, 476 [2 Cal.Rptr. 310]; see also *Axell* v. *Axell, supra,* 256; *Lineman* v. *Schmid,* 32 Cal.2d 204, 212 [195 P.2d 408, 4 A.L.R.2d 1380].) These principles preclude Spind-ler's recovery of interest in the instant case for two reasons. In the first place, since Sackett did not expressly repudiate his agreement with Spindler, the exact date of breach for the purpose of calculating interest is not certain. Secondly, since there was no available market at the time of the breach, the court was required to determine the market price based upon other factors. It follows, therefore, that since Spindler's damages could not be made certain without this determination of market value by the court, interest was not properly awarded to him.

The judgment is modified by deleting therefrom the award of interest from September 29, 1961 to the date of the entry of judgment. As so modified, the judgment is affirmed. Respond-ent Spindler to recover costs.

Sims, J., and Bray, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 29, 1967. Sullivan, J., did not participate therein.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.